STATE OF NORTH CAROLINA v. JAMES EARL ROBINSON

No. 388A95

(Filed 24 July 1997)

**1. Searches and Seizures § 150 (NCI4th)— first-degree murder—victim's car—released to finance company—no error**

The trial court did not err in a capital prosecution (life sentence) for first-degree murder by denying defendant's motion to dismiss because the State failed to preserve potentially exculpatory evidence where the car in which the victim had been sitting when shot was seized by the Sheriff's Department; a finance company requested its release; and the chief investigator obtained permission from the district attorney for the release of the car. Although defendant contends that the State should have preserved a towel found under the victim's right arm, two cigarette butts found on the floorboard, a tissue, and an empty gun case, the evidence presented at the pretrial hearing demonstrated no

STATE v. ROBINSON

[346 N.C. 586 (1997)]

bad faith on the part of law enforcement authorities and the exculpatory value of the car and other items was speculative at best. The trial court's findings that the officers acted in good faith and that no evidence was destroyed which rose to the level of constitutional materiality were supported by the evidence and are conclusive on appeal.

**Am Jur 2d, Searches and Seizures § 212.**

**Review on appeal by United States under 18 USCS § 3731 of orders suppressing or excluding evidence, or for return of seized property. 34 ALR Fed. 617.**

2. **Jury § 260 (NCI4th)— first-degree murder—jury selection—peremptory challenges—not racially motivated**

The trial court did not err during jury selection for a capital first-degree murder prosecution which resulted in a life sentence by overruling defendant's objections to the State's use of its peremptory challenges in an allegedly discriminatory manner where the prosecutor's reasons for peremptorily challenging the prospective jurors included equivocal responses to questions concerning the death penalty, trouble completing the jury questionnaire accurately and fully, deceptive answers, physical responses indicating hesitancy about the death penalty, and failure to make eye contact. The reasons given by the prosecutor must be clear and reasonably specific and related to the particular case, but may be exercised on the basis of legitimate hunches and past experience and need not rise to a level justifying exercise of a challenge for cause. The reasons given here are supported by the record and, based on the entire jury selection process, the State met its burden of coming forward with neutral, nonracial explanations for each of the challenges.

**Am Jur 2d, Jury §§ 234 et seq.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital case—post-*Witherspoon* cases. 39 ALR3d 550.**

3. **Constitutional Law § 342 (NCI4th)— first-degree murder—recorded bench conferences—outside defendant's presence—no error**

The trial court did not err in a first-degree murder prosecution by conducting recorded bench conferences with defendant

seated at counsel table where defense counsel represented defendant's interests at the conferences and had both the obligation and the opportunity to discuss matters with defendant and raise for the record any matter to which defendant objected and ask questions warranted by defendant's statements to him. Defendant has failed to demonstrate and the record does not in any way suggest that these bench conferences implicated defendant's confrontation rights or that his presence at the conferences would have had a reasonably substantial relation to his opportunity to defend.

**Am Jur 2d, Criminal Law §§ 692 et seq., 901 et seq.**

### 4. Evidence and Witnesses § 292 (NCI4th)— first-degree murder—defendant beating girlfriend—jealous rage— prior to murdering victim—admissible

There was no abuse of discretion in a first-degree murder prosecution where the trial court admitted testimony that defendant beat his girlfriend in a jealous rage prior to murdering the victim. The evidence tended to show that defendant beat his girlfriend because he thought she was involved with another man; went to a nightclub, threatened a man at gunpoint, and demanded to know whether he was having an affair with the girlfriend; and was seen talking to the victim. This was circumstantial evidence of guilt and was relevant to describe the chain of circumstances leading up to the murder; the trial court did not abuse its discretion by concluding that the evidence was relevant and that the probative value was not outweighed by the possibility of unfair prejudice. Finally, evidence that defendant beat his girlfriend on the day of the murder was later introduced through four other witnesses without objection.

**Am Jur 2d, Evidence §§ 405, 409, 447, 454.**

### 5. Evidence and Witnesses § 292 (NCI4th)— first-degree murder—evidence of defendant beating girlfriend— admissible

There was no error, much less plain error, in a first-degree murder prosecution where four witnesses were allowed to testify that defendant beat his girlfriend before killing the victim because he thought she was running around with another man. The evidence of the beating was circumstantial evidence of defendant's guilt because it was relevant to defendant's motive,

STATE v. ROBINSON

[346 N.C. 586 (1997)]

intent, and plan to kill the victim, and was additionally relevant because it described the chain of circumstances leading up to the murder.

**Am Jur 2d, Evidence §§ 405, 409, 447, 454.**

**Judicial abrogation of felony-murder doctrine. 13 ALR4th 1226.**

## 6. Homicide § 226 (NCI4th)— first-degree murder—sufficiency of evidence

There was sufficient evidence to support a first-degree murder conviction where the evidence showed that defendant brought his girlfriend into his trailer at gunpoint and forced her into the bathroom, threatened to kill her, and beat her in the head with a pistol until she was unconscious; arrived at another woman's house that evening and told her about the beating and said the incident was not over yet; proceeded to a nightclub, where he threatened a man at gunpoint and asked him if he was having an affair with his girlfriend; talked with the victim while at the club; drove later that night to another woman's home, described how he had beaten his girlfriend, and placed a pistol beneath the driver's seat of his white Cadillac as he drove away; the owner of a convenience store testified that he looked out the window after being awakened by two shots and saw a white Cadillac driving away from a red car; the victim was found shot to death in the red car; defendant arrived at another convenience store at approximately 2:00 a.m., pulled into the parking lot, and fell asleep; he was arrested a short time later; the arresting officer found the murder weapon under defendant's seat; and a ballistics expert testified that his pistol fired the fatal shots into the victim. The evidence presented clearly supports a reasonable inference—more than a mere suspicion or conjecture—that defendant was the perpetrator of the murder.

**Am Jur 2d, Homicide §§ 425-458.**

## 7. Criminal Law § 473 (NCI4th Rev.)— first-degree murder—prosecutor's argument—defense attorney as "assassin"

There was no abuse of discretion in a first-degree murder prosecution where the prosecutor was permitted to refer to defense counsel as an "assassin." The prosecutor's statement was a hyperbolic expression of the State's position that an injustice would be done to the victim if the defense counsel were to per-

suade the jury to return a not-guilty verdict and, additionally, urged the jury not to allow counsel to assassinate the victim's character.

**Am Jur 2d, Trial §§ 683 et seq.**

### 8. Criminal Law § 468 (NCI4th Rev.)— first-degree murder— prosecutor's argument—reasonable inference

A prosecutor's argument in a first-degree murder prosecution was not so grossly improper as to require intervention *ex mero motu* where defendant contended that the prosecutor impermissibly referred to matters outside the record, but the argument was a reasonable inference from the evidence. Defendant did not show that the prosecutor's comments so infected the trial with unfairness that it rendered the conviction fundamentally unfair.

**Am Jur 2d, Trial §§ 251 et seq.**

**Propriety and prejudicial effect of prosecutor's argument to jury indicating that he has additional evidence of defendant's guilt which he did not deem necessary to present. 90 ALR3d 646.**

**Supreme Court's views as to what courtroom statements made by prosecuting attorney during criminal trial violate due process or constitute denial of fair trial. 40 L. Ed. 2d 886.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Brooks, J., on 18 April 1995 in Superior Court, Bladen County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 12 December 1996.

*Michael F. Easley, Attorney General, by Clarence J. DelForge, III, Assistant Attorney General, for the State.*

*Margaret Creasy Ciardella for defendant-appellant.*

ORR, Justice.

This case arises out of the murder of Jerry Smith, who was shot twice while sitting in a parked car at a convenience store. On 30 November 1993, defendant was indicted for one count of first-degree murder. Defendant was subsequently tried before a jury, and on 13 April 1995, the jury found defendant guilty of first-degree murder

based on the theories of premeditation and deliberation and felony murder. Following a capital sentencing proceeding, the jury recommended that defendant be sentenced to life imprisonment, and the trial court entered judgment accordingly.

After consideration of the assignments of error brought forward on appeal by defendant and a thorough review of the transcript of the proceedings, the record on appeal, the briefs, and oral arguments, we conclude that defendant received a fair trial, free from prejudicial error. For the reasons set forth below, we affirm his conviction and sentence.

At trial, the State's evidence tended to show the following: On the afternoon of 26 September 1993, defendant was attending a cookout at his neighbor's home in Garland, North Carolina. Gerthel Highsmith, with whom defendant was having a relationship, was also at the cookout. At approximately 3:30 that afternoon, Highsmith and her three-year-old son, Derrick, left the cookout in defendant's Cadillac to pick up a pizza. They then returned to the cookout for a short while before Highsmith once again left in defendant's Cadillac. Highsmith's son remained at the cookout with defendant.

When Highsmith returned to the cookout, defendant was apparently very upset and ran behind the Cadillac until she stopped. As Highsmith exited the Cadillac, defendant forced her back into the car at gunpoint. They then proceeded to defendant's trailer, where Highsmith's son was waiting. Once inside the trailer, defendant began to hit Highsmith with his fist and kick her in front of her son. Highsmith begged defendant not to hit her in front of Derrick, and defendant ordered her into the bathroom. Once inside the bathroom, defendant repeatedly asked Highsmith who was in his car with her. Defendant continued to beat Highsmith with his fists and then started to hit her on the top of her head with a gun until she lost consciousness. Once Highsmith regained consciousness, defendant kicked and pushed her into the bedroom. Eventually, Highsmith's mother and sister drove by defendant's trailer and honked their car horn. Highsmith then jumped out the bedroom window and ran to the car. Her mother and sister drove her to the "rescue squad," where she was treated for her injuries.

At the time of this incident, Highsmith had known defendant for approximately four months. At trial, Highsmith testified that she used cocaine on the day defendant beat her and that she stayed with defendant because he supplied her with cocaine. She further testified

that the victim, Jerry Smith, was a drug user and had accompanied her on one occasion to defendant's house to buy drugs.

On the evening of 26 September 1993, defendant arrived around 9:00 or 10:00 p.m. in his white Cadillac at a club in Sampson County which was owned by Bill Herring. At trial, Herring testified that he observed that defendant had something in his pocket when he arrived at the club. Herring asked defendant to pull up his shirt and saw what looked like the handle of a gun. Defendant told him that it was not a gun, and Herring allowed defendant to enter the club. Herring further testified that the victim, Jerry Smith, arrived in a red Nissan shortly before defendant. Defendant and Jerry Smith stood at the counter together, but Herring could not tell if they were arguing and did not hear what they said. Herring stated that Jerry Smith left the club first that night and that defendant left fifteen or twenty minutes later.

Clarence Autry testified that he was also at the club that night. He stated that at one point, defendant pulled a gun out of his pocket and ordered him outside to talk. Once outside, defendant confronted Autry about whether he had been "messing around" with Highsmith. After Autry denied any involvement with Highsmith, defendant stated that he believed him and allowed him to return to the club. Autry further testified that Highsmith frequently told defendant things to make him jealous.

Mack Ray Rich, who owns and operates a convenience store at the Helltown Crossroads, testified that his residence is located at the intersection of Highway 210 and Helltown Road. Rich further testified that he was awakened at approximately 12:30 a.m. by two gunshots. He looked out the window and saw a white car heading towards Highway 210 and a red car sitting with its headlights on. Rich asked his wife to call the Highway Patrol. Rich testified that he then saw the same white car, a Cadillac, return and pull up beside the red car and sit there for a few minutes. The white Cadillac then proceeded to drive out Ammons Road.

Investigator Richard Herring of the Bladen County Sheriff's Department testified that he was dispatched to the intersection of Helltown Road and Highway 210 West and arrived at 1:07 a.m. Herring stated that he saw a red Nissan sitting in the parking lot facing Highway 210 with its lights on. He knew it was Jerry Smith's car and saw that Smith was slumped over in the car seat with his seat belt still on. After Herring got no response from Smith, he noticed a bullet hole in Smith's left chest.

Cathy Ann Nethercutt testified that she worked the third shift from 11:00 p.m. to 7:00 a.m. at the Quick Stop Food Mart at the intersection of Cedar Creek Road and I-95. She was working there alone on 27 September 1993 when she saw a white Cadillac drive into the parking lot at approximately 2:00 a.m. The driver never entered the store. After watching the car for an hour, Nethercutt called to report this incident to the police.

Officer Willis Stone of the Fayetteville Police Department testified that he arrived at the Quick Stop at 3:40 a.m. and approached the white Cadillac. As he approached the vehicle, he saw a black male sitting in the driver's seat with his head inclined. Officer Stone made an interior sweep of the car for his own safety and noticed a plastic bag of what appeared to be cocaine in plain view on the passenger seat. Officer Stone tapped on the car window and woke defendant up. When defendant woke up, Officer Stone asked him to unlock the door and step out of the car. Officer Stone testified that he did a quick body frisk for weapons, placed handcuffs on defendant, and put him in his patrol car. Along with the bag of cocaine Officer Stone recovered from the passenger's seat, he also found a medicine bottle containing a bag of crack cocaine and a revolver hidden underneath the driver's seat.

SBI Special Agent Eugene Bishop was tendered and qualified as an expert in the field of forensic firearm identification and toolmark identification. Agent Bishop testified that he conducted firing tests on the revolver recovered from defendant's Cadillac and studied the two spent bullets found in the victim's red Nissan. Agent Bishop "was requested to determine whether or not the fired bullets were fired by the particular weapon that was submitted in this case." After conducting tests on both 13 October 1993 and 14 October 1993, Agent Bishop concluded that the two spent bullets were fired from defendant's revolver, to the exclusion of all other handguns.

Defendant presented no evidence during the guilt/innocence phase.

During the sentencing proceeding, the State did not present additional evidence, but relied upon the evidence presented during the guilt/innocence phase of the trial.

Defendant presented the testimony of Dr. Don Creed during the sentencing proceeding. Dr. Creed was tendered and qualified as a medical expert. Dr. Creed testified that he treated defendant primarily for diabetes, hypertension, and chronic bronchitis and was aware

that defendant had been hospitalized for congestive heart failure. Defendant also presented the testimony of Dr. Brad Fisher, a clinical forensic psychologist. Dr. Fisher testified that he evaluated defendant at the request of defense counsel and conducted interviews with defendant on four separate occasions. In Dr. Fisher's opinion, defendant was not psychotic and was not suffering from any kind of significant neurological condition. He further testified that defendant's problems stemmed from an "undisciplined, almost chaotic upbringing."

## I.

[1] Defendant first contends that the trial court erred by denying defendant's motion to dismiss because the State failed to preserve potentially exculpatory evidence. Prior to trial, defendant filed a motion to dismiss or, in the alternative, to suppress certain evidence taken from the car on the grounds that the police failed to preserve other potentially exculpatory evidence they had seized. Defendant argues that the trial court's rulings violated his statutory and constitutional rights. We disagree.

In the course of the investigation, the victim's red Nissan Sentra was seized by the Sheriff's Department. Later, a finance company, which apparently had an ownership interest in the car, requested its release. The chief investigator with the Sheriff's Department obtained permission from the district attorney for the release of the car. Defendant contends that the State should have preserved from the car for his analysis a towel found under the victim's right arm, two cigarette butts found on the floorboard, a tissue, and an empty gun case. Defendant contends that the law enforcement officer in this case acted in bad faith by releasing the car and other items because they were potentially exculpatory.

In *California v. Trombetta*, 467 U.S. 479, 81 L. Ed. 2d 413 (1984), the United States Supreme Court held that in order

> [t]o meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* at 489, 81 L. Ed. 2d at 422 (citation omitted). In *Arizona v. Youngblood*, 488 U.S. 51, 102 L. Ed. 2d 281 (1988), the United States Supreme Court further stated:

> The Due Process Clause of the Fourteenth Amendment . . . makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

*Id.* at 57, 102 L. Ed. 2d at 289. The Supreme Court went on to hold "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58, 102 L. Ed. 2d at 289.

North Carolina statutory and case law imposes similar requirements. N.C.G.S. § 15-11.1(a) provides in part:

> If a law-enforcement officer seizes property pursuant to lawful authority, he shall safely keep the property under the direction of the court or magistrate as long as necessary to assure that the property will be produced at and may be used as evidence in any trial. Upon application by the lawful owner . . . or upon his own determination, the district attorney may release any property seized pursuant to his lawful authority if he determines that such property is no longer useful or necessary as evidence in a criminal trial and he is presented with satisfactory evidence of ownership. If the district attorney refuses to release such property, the lawful owner . . . may make application to the court for return of the property.

N.C.G.S. § 15-11.1(a) (Supp. 1996).

In the present case, the evidence presented at the pretrial hearing demonstrated no bad faith on the part of law enforcement authorities, and the exculpatory value of the car and other items was speculative at best. SBI Special Agent Paul Munson testified that he searched the car for all evidence, whether inculpatory or exculpatory. Agent Munson did not seize the white towel, cigarette butts, or tissue because, based on his analysis, these items had no inculpatory or exculpatory value. Agent Munson further testified that based upon his training and experience, the perpetrator fired the shot from outside the car. Agent Munson based his conclusion on the fact that the driver's side window was rolled down, the bullet tracks went from

STATE v. ROBINSON .

[346 N.C. 586 (1997)]

left to right through the victim and into the car, and the passenger side door was locked and the window rolled up. The chief investigator, Rodney Warwick of the Bladen County Sheriff's Department, confirmed Agent Munson's observations.

Based upon the above testimony, the trial court made the following findings of fact:

> [N]o law enforcement officer—or neither of these two law enforcement officers destroyed any evidence that the officers felt had exculpatory value. [The trial court] is going to further find and conclude that each of the officers acted in good faith in all their actions, as testified to before the Court here today. [The trial court] is going to find that based upon the evidence . . . there was no evidence destroyed that rose to the level of constitutional materiality as that term is used in the case law, *State versus Jones* and the *Trombetta* case.
>
> . . . .
>
> Based on the findings and conclusions we're going to deny . . . the motion to dismiss as well as the motion to suppress.

These findings of fact are supported by the evidence discussed above and presented during the pretrial motions hearing. Because the findings of fact made by the trial judge are supported by the evidence, they are conclusive on appeal. *State v. Hardy*, 339 N.C. 207, 222, 451 S.E.2d 600, 608 (1994). Thus, we hold that the law enforcement authorities in this case acted reasonably and in good faith by releasing the victim's car and declining to preserve the challenged items found in the car. Accordingly, this assignment of error is overruled.

## II.

[2] Next, defendant contends that the trial court erred in overruling defendant's objections to the State's use of its peremptory challenges in a racially discriminatory manner. Defendant argues that the trial court's ruling deprived him of his state and federal constitutional rights and that he is entitled to a new trial. We do not agree.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the North Carolina Constitution prohibit a prosecutor from peremptorily excusing a prospective juror solely on the basis of his or her race. *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69 (1986); *State v. Williams*,

## STATE v. ROBINSON

[346 N.C. 586 (1997)]

339 N.C. 1, 15, 452 S.E.2d 245, 254 (1994), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 61 (1995). A three-step process has been established for evaluating claims of racial discrimination in the prosecution's use of peremptory challenges. *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405 (1991). First, defendant must establish a *prima facie* case that the peremptory challenge was exercised on the basis of race. *Id.* Second, if such a showing is made, the burden shifts to the prosecutor to offer a race-neutral explanation to rebut defendant's *prima facie* case. *Id.* Third, the trial court must determine whether the defendant has proven purposeful discrimination. *Id.*

In the present case, defendant challenged the State's use of peremptory challenges to excuse black jurors. The trial court then determined that defendant had made a *prima facie* showing of racial discrimination and ordered the State to offer nonracial justification for each of the seven black prospective jurors who were excused. After the prosecutor stated his reasons for striking each of the challenged jurors, the trial judge entered lengthy findings of fact and conclusions of law and denied defendant's *Batson* motion.

In order to rebut a *prima facie* case of discrimination, the prosecution must "articulate legitimate reasons which are clear and reasonably specific and related to the particular case to be tried which give a neutral explanation for challenging jurors of the cognizable group." *State v. Jackson*, 322 N.C. 251, 254, 368 S.E.2d 838, 840 (1988), *cert. denied*, 490 U.S. 1110, 104 L. Ed. 2d 1027 (1989). These reasons " 'need not rise to the level justifying exercise of a challenge for cause.' " *State v. Porter*, 326 N.C. 489, 498, 391 S.E.2d 144, 151 (1990) (quoting *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88). Peremptory challenges may be exercised on the basis of " 'legitimate "hunches" and past experience[,]' so long as there is an absence of racially discriminatory motive." *State v. Jones*, 339 N.C. 114, 140, 451 S.E.2d 826, 839 (1994) (quoting *Porter*, 326 N.C. at 498, 391 S.E.2d at 151), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 873 (1995). Further, when the prosecutor has proffered his explanations for the peremptory strikes and the trial court has ruled that there was no purposeful discrimination, the only issue for this Court is whether the trial court correctly determined that the prosecutor had not intentionally discriminated. *Williams*, 339 N.C. at 17, 452 S.E.2d at 255. Because the trial court is in the best position to assess the prosecutor's credibility, we will not overturn its determination absent clear error. *Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412.

STATE v. ROBINSON

[346 N.C. 586 (1997)]

Applying these principles, we now examine the prosecutor's reasons for peremptorily challenging the prospective jurors. In his brief, defendant challenges the legitimacy of five of the prosecutor's peremptory strikes. First, defendant contends Mary Jones, a black female, was improperly struck for racial reasons. At trial, the prosecutor offered the following reasons for exercising this peremptory challenge:

> In responses to the death qualifications, when asked if she was opposed to the death penalty, her response initially was yes and no. Her next response was, "But who am I to judge?", which would have indicated to the State that . . . she would not make a decision about the death penalty, or about any issue in the case. She initially said that she had not talked to anyone at all about this case, and I believe she indicated that her son, Willie Lewis, did work in the jail where they were looking after [defendant]. She also had trouble completing her questionnaire accurately and fully. Those would be the reasons that the state peremptorily struck Mary Jones, who was a black female.

This Court has repeatedly held that a juror's equivocal responses concerning the death penalty constitute a race-neutral ground for exercising a peremptory challenge. *State v. Conaway,* 339 N.C. 487, 513, 453 S.E.2d 824, 840, *cert. denied,* —— U.S. ——, 133 L. Ed. 2d 153 (1995). This Court has also held that a prospective juror's difficulty in understanding instructions, and oral responses which differ from responses written on the jury questionnaire, are race-neutral. *State v. Carter,* 338 N.C. 569, 587, 451 S.E.2d 157, 166-67 (1994), *cert. denied,* —— U.S. ——, 132 L. Ed. 2d 263 (1995). Because the above reasons given by the prosecutor are supported by the record, we hold that the trial court did not err in determining that the prosecutor did not engage in purposeful discrimination when he struck prospective juror Jones.

Second, defendant contends that the prosecutor committed purposeful discrimination when the prosecutor exercised a peremptory challenge on Deangelo Johnson, a black female prospective juror. The prosecutor informed the trial court that he struck Johnson because when he asked her about the death penalty, her response was slow and she "hung her head." This verbal and physical response indicated that Johnson was hesitant and equivocal about the death penalty. As stated above, this constitutes a race-neutral reason for exercising a peremptory challenge. *Conaway,* 339 N.C. at 513, 453 S.E.2d at 840.

Third, defendant contends that the prosecutor engaged in purposeful discrimination by striking Thalia Hammonds, a black female prospective juror. The prosecutor indicated to the trial court that he felt Hammonds was being deceptive in giving some of her answers on *voir dire*. For example, the prosecutor noted that, initially, Hammonds denied having any relatives who were charged with anything other than a misdemeanor. However, the prosecutor was aware of the criminal records of some of her nephews, and after pressing her, Hammonds finally admitted that she had a relative who had been charged with assault with a deadly weapon. Additionally, the State was aware of a relative who had a criminal record that she failed to mention. This Court has previously held that a prosecutor's feeling that a prospective juror gave misleading answers to questions on *voir dire* is a valid nonracial purpose for exercising a peremptory challenge. *State v. Smith*, 328 N.C. 99, 125-26, 400 S.E.2d 712, 727 (1991). Here, the record supports the prosecutor's contention, and accordingly, the prosecutor did not purposefully discriminate when he exercised a peremptory challenge against prospective juror Hammonds.

Fourth, defendant contends that the prosecutor engaged in purposeful discrimination by striking Linwood Patterson, a black male prospective juror. The prosecutor stated that he struck Patterson because

> [h]is responses on the issue of the death penalty were, "I don't really know", that, "It might fit in certain situations." And he was very confrontational with myself as we went through the process—would not make eye contact—very short with his answers, and he was struck for that reason.

This Court has previously held that a prospective juror's failure to make appropriate eye contact with the prosecutor, when coupled with other factors, constitutes a valid, nonracial reason for exercising a peremptory strike. *See Porter*, 326 N.C. at 500, 391 S.E.2d at 152. Thus, the prosecutor did not commit purposeful discrimination by exercising a peremptory strike against prospective juror Patterson.

Finally, defendant contends that the prosecutor committed purposeful discrimination by striking Martha Bellamy, a black female prospective juror. The prosecutor stated the following reasons for striking Bellamy:

> [She] said that she would always choose life, said that she supposes if "they" voted for the death penalty that then she may be

able to go along with that, referring to other jurors, but . . . she was very, very[] wishy-washy as to the imposition of the death penalty whereas to the responses about life . . . she readily had an answer for that.

As stated above, this Court has repeatedly held that a hesitant or equivocal response concerning the death penalty is a race-neutral reason for exercising a peremptory challenge. *Conaway,* 339 N.C. at 513, 453 S.E.2d at 840. Thus, the prosecutor did not commit purposeful discrimination in striking prospective juror Bellamy.

Based on the reasons given by the prosecutor, which are supported by the record, and based on the entire jury selection process, we conclude that the State has met its burden of coming forward with neutral, nonracial explanations for each of the peremptory challenges defendant assigns as error. Thus, the excusals of the prospective jurors, as discussed above, were not racially motivated and are not clearly erroneous. Accordingly, this assignment of error is overruled.

## III.

[3] Defendant next contends that the trial court committed prejudicial error by conducting recorded bench conferences outside the presence of defendant while defendant was seated at counsel table. Defendant argues that by holding these bench conferences, the trial court violated defendant's nonwaivable constitutional right to be present at every stage of his trial, and thus, defendant is entitled to a new trial.

The defendant in a capital trial must be present at every stage of the proceeding. N.C. Const. art. I, § 23. This constitutional mandate serves to safeguard both the defendant's and society's interests in reliability in the imposition of capital punishment. *State v. Huff,* 325 N.C. 1, 30, 381 S.E.2d 635, 651 (1989), *sentence vacated on other grounds,* 497 U.S. 1021, 111 L. Ed. 2d 777 (1990). However, this Court has held that a defendant's constitutional right to be present at all stages of his capital trial is not violated when the trial court conducts a bench conference among the lawyers in open court where defendant is present in the courtroom. *State v. Buchanan,* 330 N.C. 202, 223, 410 S.E.2d 832, 845 (1991). If, however, the subject matter of the conference

implicates the defendant's confrontation rights, or is such that the defendant's presence would have a reasonably substantial relation to his opportunity to defend, the defendant would have a

constitutional right to be present. The burden is on the defendant to show the usefulness of his presence in order to preserve a violation of his right to presence. Once a violation of the right is apparent, the burden shifts to the State to show that it is harmless beyond a reasonable doubt.

*Id.* at 223-24, 410 S.E.2d at 845 (citations omitted).

Here, defendant specifically claims he was prejudiced by two recorded bench conferences which took place outside of his presence while defendant was seated at counsel table. First, during a recorded bench conference, the State alleged defendant had made additional statements to Gerthel Highsmith other than the one she mentioned during her testimony. Defendant contends that if he had been present during this bench conference, he could have assisted in determining whether Highsmith had testified to everything that happened. However, defense counsel represented defendant's interests at the bench conference and had both the opportunity and obligation to discuss this matter with defendant and raise for the record any matter to which defendant objected. *Id.* at 223, 410 S.E.2d at 844-45. Further, there is nothing in the record to suggest that defendant was in any way prejudiced by the bench conference, and defendant's assertion to the contrary is merely speculation.

Next, defendant contends he was prejudiced by a recorded bench conference which was held when his lawyer made an offer of proof concerning a statement made by defendant at the time of his arrest. The trial court ruled that this evidence was not admissible, but stated that defendant could make an offer of proof by having the arresting officer whisper his answer to the court reporter. Defense counsel stipulated to this procedure. Defendant now contends he was prejudiced because he did not hear what the officer said during the bench conference and would therefore not know whether there was any reason to challenge the veracity of the officer's testimony.

Once again, defense counsel had both the opportunity and the obligation to discuss this matter with defendant and ask any further questions of the witness if warranted by defendant's statements to counsel. *Id.* Further, there is nothing in the record to suggest that defendant was prejudiced by this recorded bench conference. Additionally, we note that it was defense counsel's request that this witness be allowed to answer on the record. Defendant had access to everything contained in the record at trial, and defense counsel had an opportunity to object to the testimony of the witness.

Finally, as this Court has previously stated with regard to bench conferences:

> Not only have federal courts treated such conferences as outside the scope of the trial for purposes of defendant's constitutional right to be present, but they also have found waiver where, as here, defendant made no request to be present and no objection to his absence. Defendant's attorneys were present at each of the conferences to represent and protect his interests.

*Id.* at 215, 410 S.E.2d at 839.

Defendant has failed to demonstrate, and the record does not in any way suggest, that the bench conferences here implicated defendant's confrontation rights or that his presence at the conferences would have had a reasonably substantial relation to his opportunity to defend. Accordingly, this assignment of error is overruled.

## IV.

[4] Next, defendant contends that the trial court erred by admitting testimony that defendant beat his girlfriend, Gerthel Highsmith, out of a jealous rage prior to murdering the victim. Defendant argues the admission of this testimony violated N.C.G.S. § 8C-1, Rules 401, 402, 403, and 404 and his constitutional right to a fair trial and to due process. We disagree.

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Further, Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C.G.S. § 8C-1, Rule 403 (1992). "Whether to exclude evidence under Rule 403 is a matter within the sound discretion of the trial court, and its ruling may be reversed for abuse of discretion only upon a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Collins*, 345 N.C. 170, 174, 478 S.E.2d 191, 194 (1996).

First, defendant contends that at the hearing on his motion *in limine*, the trial court erred by denying his motion to prohibit Highsmith from testifying concerning the beating. At the hearing, the

STATE v. ROBINSON

[346 N.C. 586 (1997)]

State argued that the evidence showing that defendant beat Highsmith in the head with the same pistol used to murder the victim was admissible under Rule 404(b) for the purpose of identity. Furthermore, the State argued that the beating was also relevant to defendant's motive, intent, and plan to kill the victim.

Here, the evidence tended to show that defendant beat Highsmith because he thought she was involved with another man. Later that same evening, defendant went to a nightclub, threatened Autry at gunpoint, and demanded to know whether he was having an affair with Highsmith; defendant was also seen talking to the victim at the same club. This constitutes circumstantial evidence of defendant's guilt. In addition, evidence of the beating was also relevant because it described the chain of circumstances leading up to the murder. *See State v. Rose*, 339 N.C. 172, 451 S.E.2d 211 (1994) (chain-of-events evidence admissible to establish defendant's intent and motive for the murders), *cert. denied*, —— U.S. ——, 132 L. Ed. 2d 818 (1995). Thus, the trial court did not abuse its discretion by concluding that the evidence was relevant and that the probative value of the Rule 404(b) evidence was not outweighed by the possibility of unfair prejudice under Rule 403.

Finally, evidence that defendant beat Highsmith on the day of the murder was later introduced through four other witnesses without objection. These witnesses were Dr. Verrilli, Mary Crumpler, Clarence Autry, and Bernette Murphy. It is well established that a criminal defendant loses the benefit of an objection when the same or similar evidence is later admitted without objection. *State v. Alford*, 339 N.C. 562, 570, 453 S.E.2d 512, 516 (1995).

[5] Next, defendant contends the trial court erred by allowing the four witnesses mentioned above to testify that defendant beat Highsmith and did so because he thought she was "running around with" another man. Because defendant did not object to this testimony at trial, we review this issue for plain error.

Plain error is "a 'fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done,' or 'where [the error] is grave error which amounts to a denial of a fundamental right of the accused.' " *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.) (footnotes omitted), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513 (1982)). Although *Odom* dealt with

jury instructions, we have applied the plain error rule to the admission of evidence. *State v. Black*, 308 N.C. 736, 741, 303 S.E.2d 804, 806 (1983).

As we have previously stated, the evidence of the beating was circumstantial evidence of defendant's guilt because it was relevant to defendant's motive, intent, and plan to kill the victim. Additionally, the evidence of the beating was relevant because it described the chain of circumstances leading up to the murder. Thus, we find no error, much less plain error, in the trial court's admission of the witness' testimony.

## V.

[6] Next, defendant contends that the trial court erred in denying his motion to dismiss because the evidence was insufficient to support defendant's conviction. Defendant argues that the trial court committed numerous errors without which there was insufficient evidence to convict defendant.

In ruling on a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Bell*, 311 N.C. 131, 138, 316 S.E.2d 611, 615 (1984). The State must present substantial evidence of each element of the offense charged. *State v. Alford*, 329 N.C. 755, 759-60, 407 S.E.2d 519, 522 (1991). "If there is substantial evidence—whether direct, circumstantial, or both—to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied." *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 382-83 (1988). If the evidence "is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed." *State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983).

In the present case, the State had to prove beyond a reasonable doubt that defendant unlawfully killed the victim with malice, premeditation, and deliberation, or that he killed the victim during the course of discharging a firearm into occupied property. The evidence showed that on the afternoon of 26 September 1993, defendant brought Highsmith into his trailer at gunpoint and forced her into the bathroom. He then threatened to kill her, but instead beat her in the head with a pistol until she was unconscious. At approximately 7:30

STATE v. ROBINSON

[346 N.C. 586 (1997)]

p.m. that same evening, defendant arrived at Mary Crumpler's house and told her about the beating and said the incident was not over yet. Defendant then proceeded to a nightclub, where he threatened Clarence Autry at gunpoint and asked him if he was having an affair with Highsmith. While at the club, defendant also spoke with the victim. Later that night, defendant drove to Bernette Murphy's home, where he proceeded to describe how he beat Highsmith. Murphy testified that, upon leaving her house, defendant placed a pistol beneath the driver's seat of his white Cadillac and drove away.

Mack Rich, the owner of the Helltown Crossroads Convenience Store, testified that he was awakened by two shots. Rich further testified that he looked out the window and saw a white Cadillac driving away from a red car. The victim was found shot to death in the driver's seat of the red car. At approximately 2:00 a.m., defendant arrived at a convenience store on Cedar Creek Road. Defendant pulled into the parking lot and fell asleep behind the wheel. After watching the car for about an hour, the store clerk called the police. When defendant was arrested a short time later, the arresting officer found the murder weapon under defendant's seat in the white Cadillac. The ballistics expert testified that this pistol fired the fatal shots into the victim.

The evidence presented clearly supports a reasonable inference—more than a mere suspicion or conjecture—that defendant was the perpetrator of the murder. Accordingly, this assignment of error is overruled.

## VI.

[7] In his final assignment of error, defendant contends that the trial court erred by permitting the prosecutor to make allegedly improper arguments to the jury. Defendant argues that during closing argument, over defendant's objection, the prosecutor was permitted to refer to defense counsel as an "assassin," and later, without objection, the prosecutor impermissibly made references to matters outside the record. Defendant argues that each of these improper comments was prejudicial to defendant and that he is entitled to a new trial. We do not agree.

First, we will address defendant's contention that the prosecutor was permitted to refer to defense counsel as an "assassin." Defendant argues that Judge Brooks erred by overruling the following objection to the prosecutor's argument:

STATE v. ROBINSON

[346 N.C. 586 (1997)]

Now, ladies and gentlemen, when you consider the evidence as the State has presented it for you, when you hear the argument that Mr. Grady will make to you, remember he's defending James Earl Robinson. James Earl Robinson is the man that is on trial. Do not let Mr. Grady kill Jerry Lee Smith again.

MR. GRADY: Objection.

COURT: Overruled.

MR. WARREN [the prosecutor]: Do not allow him to assassinate his character, because Jerry Lee Smith is not here to defend himself. Jerry Lee Smith is dead.

Arguments of counsel are left largely to the control and discretion of the trial judge, and counsel is allowed wide latitude in the argument of hotly contested cases. *State v. Williams*, 317 N.C. 474, 481, 346 S.E.2d 405, 410 (1986). Further, the remarks are to be viewed in the context in which they are made and the overall factual circumstances to which they referred. *State v. Womble*, 343 N.C. 667, 692-93, 473 S.E.2d 291, 306 (1996), *cert. denied*, —— U.S. ——, 136 L. Ed. 2d 719 (1997).

In *State v. Pittman*, 332 N.C. 244, 262, 420 S.E.2d 437, 447 (1992), the prosecutor stated that if the defendant was found not guilty, "justice in Halifax County will be dead." We held that this argument was not improper because it was a hyperbolic expression of the State's position that a not-guilty verdict would be an injustice in light of the evidence of guilt. Similarly, in the present case, the prosecutor's statement to "not let Mr. Grady kill Jerry Lee Smith again" was a hyperbolic expression of the State's position that if the defense counsel were to persuade the jury to return a not-guilty verdict, an injustice would be done to the victim. Additionally, the statement urged the jury not to give credence to the defense counsel's suggestion that Smith was a violent person. As the prosecutor continued his argument, he argued to the jury to "not allow [Mr. Grady] to assassinate [Jerry Lee Smith's] character." While rich in hyperbole, we find no error in these arguments of the prosecutor.

[8] Second, we address defendant's contention that the prosecutor impermissibly referred to matters outside the record in his closing argument. Where, as here, defendant failed to object to the argument, defendant must establish that the argument was so grossly improper that the trial court abused its discretion by not intervening *ex mero*

*motu.* To establish such an abuse, defendant must show the prosecutor's comments so infected the trial with unfairness that it rendered the conviction fundamentally unfair. *Rose,* 339 N.C. at 202, 451 S.E.2d at 229.

The portion of the prosecutor's argument to which defendant now objects is as follows:

And we know that he [the victim, Jerry Smith] knew James Robinson. And he rolled down his window to speak to him, by pre-arrangement from Herring's Nightclub. And James Robinson fired two shots into the red Nissan. One, you can see the angle lines that are drawn as it goes through the seat. And the other that went through Jerry's heart. He was waiting on somebody he knew, folks. In a rural area at quarter to one in the morning, at a predesignated spot. No, he has no reason to expect any arms coming to him; he's had a nice conversation with the defendant at Herring's Nightclub. James Robinson got out of his car, walked over, fired two shots, one killing Jerry Smith.

Defendant argues that although it is clear that the State's theory of the case was that defendant killed the victim because he thought the victim was having an affair with defendant's girlfriend, the State failed to present a scintilla of evidence to support this theory. Defendant also argues that although defendant and the victim were seen having a conversation at a club earlier on the night of the murder, there is nothing to support the inference that any meeting was prearranged between the two. Defendant contends that because there is no fact to support any inference that a meeting was held, the trial court committed plain error by failing to intervene *ex mero motu* during the prosecutor's closing argument.

In the present case, the evidence showed that defendant went to Herring's nightclub and threatened Autry at gunpoint and asked him if he was having an affair with Highsmith. Autry denied having an affair, and defendant stated that he believed Autry and let him go back inside the nightclub. Defendant then approached the victim, Smith, and spoke with him, apparently without arguing. Then, around 12:30 or 1:00 a.m., Smith drove to Helltown Crossroads Convenience Store and parked his car, leaving his headlights on. The State's evidence tends to show that defendant drove up to Smith's car and shot him to death. From this evidence, the prosecutor could reasonably infer that Smith and defendant had prearranged their meeting at the

convenience store. Thus, the prosecutor's argument was not so grossly improper as to require the trial court to intervene *ex mero motu*. Accordingly, this assignment of error is overruled.

Having reviewed each of defendant's assignments of error brought forward on appeal, we conclude that defendant received a fair trial, free from prejudicial error.

NO ERROR.