STATE OF NORTH CAROLINA v. TERRENCE DION BOWMAN A/K/A
TERRENCE TAYLOR

No. 142A97

(Filed 31 December 1998)

**1. Jury § 50 (NCI4th)— first-degree murder—jury venire— racial composition**

The trial court did not err in a capital prosecution for first-degree murder by denying defendant's pretrial motion to quash the jury venire based on an underrepresentation of African-

**STATE v. BOWMAN**

[349 N.C. 459 (1998)]

American citizens in the jury pool. The State does not dispute that the first prong of the test under *Duren v. Missouri*, 439 U.S. 357, for establishing a *prima facie* case of disproportionate representation has been satisfied; as to the second prong, it cannot be concluded that the disparity between the percentage of African-Americans in the county's population and those in the jury pool established a *prima facie* case of disproportionate representation because, under *Turner v. Fouche*, 396 U.S. 346, merely showing a disparity will not alone establish a *prima facie* case of disproportionate representation; and, under the third prong of the *Duren* analysis, defendant failed to present any evidence showing that the jury selection process was tainted by the systematic exclusion of African-Americans from the jury pool. Statistics concerning one jury pool, standing alone, are insufficient to meet the third prong of *Duren*.

2. **Jury § 227 (NCI4th)— capital first-degree murder—jury selection—excusal of juror for cause—difficulty voting for death sentence**

The trial court did not abuse its discretion during jury selection in a capital prosecution for first-degree murder by allowing the State's challenge for cause of a prospective juror who indicated that she might have difficulty voting in favor of a death sentence. The juror first indicated that she could not recommend a death sentence; after questioning by defendant, she replied that she could; and the trial court inquired further and allowed the prosecutor's for-cause challenge, finding that the prospective juror's views concerning the death penalty would prevent or substantially impair her performance as a juror. It has previously been noted that a prospective juror's bias for or against the death penalty cannot always be proven with clarity and, absent an abuse of discretion, it is the trial court's decision as to whether the prospective juror's beliefs would affect her performance as a juror. In light of the questioning and responses here, it cannot be concluded that the trial court abused its discretion by excusing this juror.

3. **Criminal Law § 550 (NCI4th Rev.)— capital first-degree murder—prosecutor's leading questions—impermissible statements by witnesses—no mistrial**

The trial court did not abuse its discretion in failing to declare a mistrial *ex mero motu* in a capital prosecution for first-degree murder where defendant contended that the prosecutor

repeatedly asked the State's witnesses leading questions and that the State's witnesses made impermissible and prejudicial statements. A review of the record reveals that the trial court sustained defendant's objections and issued curative instructions and it cannot be concluded that the questions or statements, or their cumulative effect, amounted to such serious impropriety that it was impossible for defendant to obtain a fair trial.

**4. Criminal Law § 820 (NCI4th Rev.)— instructions—defendant's failure to testify—not required**

The trial court did not err in a capital prosecution for first-degree murder by instructing the jury on defendant's right not to testify when defendant did not request such an instruction. It has been consistently held that, while it is the better practice not to give the instruction absent a request, giving such an instruction does not constitute prejudicial error.

**5. Criminal Law § 473 (NCI4th Rev.)— first-degree murder—prosecutor's argument—comments regarding defense counsel**

There was no misconduct so improper as to deprive defendant of his due process right to a fair trial in a capital prosecution for first-degree murder where the prosecutor argued that "reasonable doubt is not created or manufactured by lawyers getting up here and arguing to you and trying to do those lawyer trick things." The comment was not directed clearly and specifically toward the defense counsel in this case, the prosecutor did not use abusive, vituperative, or opprobrious language, and the statement was isolated and not a repeated attempt to diminish defense counsel before the jury.

**6. Criminal Law § 472 (NCI4th Rev.)— first-degree murder—defense arguments—reasonable doubt definition**

There was no prejudicial error in a capital prosecution for first-degree murder where the trial court sustained the prosecutor's objection to defense counsel's argument defining reasonable doubt with "moral certainty" language. After this argument was made during the guilt phase, the trial court recommended that, in their final argument, defense counsel clarify for the jurors that they must be convinced to an evidentiary certainty rather than to a moral certainty, but defense counsel then argued to the jury that reasonable doubt is an evidentiary standard and that a shorthand way of saying it would be "if you can look in the mirror after

you make a decision." Considered in context, defense counsel's statement served to reassert the concept of moral conscience and to disassociate this from the sufficiency of the evidence; since the trial court had previously instructed defense counsel not to define reasonable doubt with moral certainty language, the court did not err by sustaining the prosecutor's objection. However, assuming that the court erred in sustaining the objection, the error was cured because the court thereafter correctly instructed the jury as to reasonable doubt in accordance with the pattern jury instruction.

**7. Criminal Law § 882 (NCI4th Rev.)— first-degree murder—jury deliberation—question by jury—interpretation by bailiff**

The trial court did not err in a capital prosecution for first-degree murder where, during the guilt phase deliberations, the trial court received a written inquiry from the jury seeking an explanation of premeditation, the bailiff asked if he might address the court, the court gave the bailiff permission to speak and the bailiff indicated that what the jury wanted to know was if there is a time limit on premeditation, the court informed counsel that he would respond by repeating only the relevant portions of the jury charge, and the court repeated its previous instructions regarding premeditation and deliberation. The record reveals that the trial court did not rely exclusively on the bailiff's explanation, personally addressed the jury, and proceeded with its instructions only after it was satisfied that it correctly understood the jury's question. There is nothing in the record to indicate that the trial court addressed only the bailiff's interpretation and ignored the jurors' written inquiry.

**8. Criminal Law § 1077 (NCI4th Rev.)— first-degree murder—penalty phase—evidence—victim impact statements**

There was no plain error in a capital sentencing proceeding where the trial court admitted victim impact evidence. There is no evidence in the record which suggests that the jury based its decision for the death penalty on this evidence and nowhere in the closing argument did the prosecutor argue for the jury to impose the death penalty based on the impact the murders had on the victims' families. It cannot be concluded that this evidence served any purpose other than to remind the jury that the victims were sentient beings with close family ties before they were murdered by defendant.

STATE v. BOWMAN

[349 N.C. 459 (1998)]

**9. Criminal Law § 1077 (NCI4th Rev.)— capital sentencing— victim impact evidence—victims' mothers' feelings toward death sentences—questioning not allowed**

The trial court did not err in a capital sentencing proceeding by precluding defendant from questioning the victims' mothers about their feelings toward the death sentences in this case after they gave victim impact evidence. This evidence has no bearing as to defendant's character, prior record, or the circumstances of his offense.

**10. Criminal Law § 1342 (NCI4th Rev.)— capital sentencing—cross-examination of defendant—parole from prior conviction**

There was no plain error in a capital sentencing proceeding where the court allowed the prosecution to cross-examine defendant concerning the fact that he was on parole from a conviction in New York at the time he committed these murders. Defendant opened the door by testifying on direct examination about his prior convictions and his early release on parole; additionally, there is no evidence suggesting that the prosecutor attempted to connect defendant's prior record to improper parole considerations with respect to sentencing.

**11. Criminal Law § 1402 (NCI4th Rev.)— death sentence—not arbitrary**

The record fully supported the aggravating circumstance found by a jury which sentenced defendant to death and there was no indication that the sentences were imposed under the influence of passion, prejudice or any other arbitrary factor.

**12. Criminal Law § 1402 (NCI4th Rev.)— death sentence—proportionate**

A sentence of death was not disproportionate where defendant was convicted of two counts of first-degree murder under the theory of premeditation and deliberation and the aggravating circumstance found by the jury is one of four statutory circumstances which have been held sufficient standing alone to support a sentence of death.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Meyer, J., at the 3 February 1997 Criminal Session of Superior Court, Lenoir County, upon jury verdicts finding defendant guilty of two

counts of first-degree murder. Heard in the Supreme Court 28 September 1998.

*Michael F. Easley, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Marshall L. Dayan for defendant-appellant.*

LAKE, Justice.

The defendant was indicted on 20 May 1996 for two counts of first-degree murder. Defendant was tried capitally to a jury at the 3 February 1997 Criminal Session of Superior Court, Lenoir County, the Honorable Louis B. Meyer presiding. The jury found defendant guilty of both counts of first-degree murder on the basis of premeditation and deliberation. Following a capital sentencing proceeding, the jury recommended sentences of death as to each murder conviction. On 18 February 1997, the trial court sentenced defendant to two separate sentences of death, one for each of the two convictions for first-degree murder.

At trial, the State's evidence tended to show that Venice Taylor, a first cousin of defendant's, knew that Antoinette Gilchrist had been selling marijuana for defendant for approximately six months prior to the murders. Venice Taylor stated that he was at his uncle Charles Taylor's home in the Simon Bright Apartments about one week before the murders, which occurred on 13 January 1996. Defendant, who shared the apartment with Charles Taylor, was also in the apartment at this time. Venice Taylor overheard defendant talking on the phone with Gilchrist. Defendant was discussing how some "weed" was stolen from Gilchrist, and defendant told Gilchrist to show him who took it. Following this phone conversation, defendant stated that whoever had stolen his marijuana was going to get his "sh— pushed back." Venice Taylor (hereinafter "Taylor") testified that he understood this phrase to mean that defendant was going to shoot someone in the head. Defendant then left to go to Gilchrist's house.

The next morning, Taylor again saw defendant at his uncle's apartment. Defendant told Taylor that he was going to return to New York. Defendant frequently traveled back and forth between New York and Kinston, but he resided in New York. While in Kinston, defendant stayed with either Charles Taylor or with Crystal Jones, who lived nearby. Defendant also kept a lot of marijuana at Gilchrist's house.

STATE v. BOWMAN

[349 N.C. 459 (1998)]

On 12 January 1996, approximately one week after Taylor last saw defendant, Taylor was at his uncle's home with his cousins, Johnny James and Chris Kent, and a "dude" from Maryland whom he did not know. It was close to 10:30 p.m., and they were all watching a basketball game on television. At that time, defendant and Bobby Jennings entered the apartment and sat down. Taylor, Jennings and defendant left the apartment to obtain beer, returned and then drove to a local nightclub called "The Vibe" in James' Mercedes Benz. In the car, and before they arrived at The Vibe, defendant stated that "somebody's going to get it tonight."

Inside the club, Clarence Jones approached Taylor and asked him for a cigarette. Approximately thirty minutes after they arrived at the club, Michael Cannon entered the club to find Taylor. Cannon took Taylor outside The Vibe, where Taylor observed defendant holding one of the victims, Michael Smith, by his coat collar. Defendant told Smith, "I know you robbed me, so you'll pay for it." At the same time, defendant held a gun to Smith's back. Taylor grabbed defendant and pulled him away from Smith. Defendant then pointed the gun at the head of a man named Chad. Taylor and James grabbed defendant's hand because they thought he was going to shoot Chad. While this occurred, the two victims, Michael Smith and Clarence Jones, walked away from the club.

When the Vibe closed for the night, James, Kent, Taylor, defendant and the "dude" from Maryland got back into the Mercedes Benz and proceeded to get something to eat. They rode to a take-out restaurant located next to K-town Taxi. After thirty minutes at the restaurant, they all rode to an area of Kinston known as "Georgetown." Once in Georgetown, they stopped at a house because James wanted to see his girlfriend. She was not there, but the house was filled with people playing pool and drinking alcohol. A fight began inside the house, and defendant participated in this fight. Immediately after the fight, Taylor, James, Kent, defendant and the "dude" from Maryland got back into the Mercedes Benz and drove away.

After leaving the house in Georgetown, they drove to Crystal Jones' house for the second time that night. Taylor knew that defendant kept his cocaine and guns at Jones' house. Everyone waited inside the car while defendant entered Jones' house. After approximately ten minutes, defendant returned to the Mercedes Benz. They all rode in the car to Simon Bright Apartments. From the car, defend-

ant saw the two victims, Michael Smith and Clarence Jones. Defendant got out of the car and walked over to Smith and Jones. It appeared to Taylor that defendant was speaking to Smith, but Taylor could not hear anything because the car windows were up. Approximately one minute after defendant left the car, defendant shot Smith. Defendant then shot Jones.

Defendant got back into the car and told Taylor to "forget them country boys. They should not have robbed me." At defendant's request, James drove the Mercedes Benz to Yashica Miller's house located in the Richard Green Apartments. On the way to Miller's apartment, Taylor repeatedly asked defendant why he had to do it, and defendant answered that the victims should not have robbed him. Defendant also stated that Smith and Jones "got it flatbush style in the head."

Once they arrived at Miller's house, everyone stayed inside the car except the defendant. Defendant entered the house and stayed approximately five to ten minutes. Defendant then got back into the Mercedes Benz. Taylor, James, Kent and the "dude" from Maryland were still in the car. They all drove to the Sheraton Inn. On the way to the Sheraton Inn, they drove over a bridge where defendant threw bullet shells out the car window. Defendant and Taylor were still arguing about the murders while riding to the Sheraton Inn.

When they arrived at the Sheraton, everyone from the Mercedes Benz went inside. The five men shared two connecting rooms. Sometime after 12:00 p.m. the next day, defendant received a page on his beeper. Defendant called the Kinston Police Department and learned that the police had a warrant for him. When defendant told Taylor about the warrant, defendant laughed. Defendant then stated that since the police were coming, he needed to switch rooms. Defendant called the Comfort Inn, which was across the street from the Sheraton, and he inquired as to whether the Comfort Inn had any rooms available. Defendant sent the "dude" from Maryland over there and told James, Kent and Taylor not to say anything to the police. Approximately thirty minutes later, the police arrived.

Initially, defendant tried to hide under the mattress when the police knocked on his motel room door. Defendant then changed his mind, answered the door and told the police his name was Eric Fludd. Both Taylor and defendant were taken to the police station and placed in custody. At this point, Taylor told the police everything defendant had done.

At trial, Yashica Miller testified that she was dating defendant in January 1996. She stated that defendant came to her house early on the morning of 13 January 1996. Defendant asked if he could leave a gun at her place. Defendant left after five or ten minutes. Later that same morning, the police stopped by Miller's house. They were looking for defendant, and they told Miller that defendant had been involved in a shooting. Miller did not tell the police about the gun; rather, she hid the gun inside a paper bag and placed the bag under a bush in a nearby park. Later, she called the police, told them the gun was in the park, went with the police to the park and retrieved the gun from where she had left it.

[1] In his first assignment of error, defendant contends that the trial court erred in denying his pretrial motion to quash the jury venire based on an underrepresentation of African-American citizens in the jury pool. Defendant submitted a certified copy of the 1990 census for Lenoir County in support of his motion. The census indicated that Caucasians constituted 59.9% of the county's population, while African-Americans represented 39.17% of the population. However, the venire summoned for jury service contained 75% Caucasians and 23% African-Americans. Defendant argues in his brief that this resulted in a 16.17% absolute disparity between the percentage of African-Americans in the general population and their percentage in the venire.

The State disagrees with defendant's calculations. The State points out that in his challenge to the jury panel, defendant states that "[t]he jurors summoned include 48 white males (37.5%), 49 white females (38.3%), 12 black males (9.4%) and 19 black females (14.8%)." The State claims that this results in a jury pool made up of 24.2% African-Americans, and a disparity of 14.8%. Therefore, depending on whether the defendant's or the State's calculations are correct, the disparity between the number of African-Americans in the general population and their proportion in the venire is either 16.17% or 14.8%.

Our state and federal Constitutions protect a criminal defendant's right to be tried by a jury of his peers. U.S. Const. amend. VI; N.C. Const. art. I, §§ 24, 26. This constitutional guarantee assures that members of a defendant's "own race have not been systematically and arbitrarily excluded from the jury pool which is to decide [his] guilt or innocence." *State v. McNeill*, 326 N.C. 712, 718, 392 S.E.2d 78, 81 (1990). The United States Supreme Court has set forth a three-part

test for determining whether a defendant's Sixth Amendment right to a fair cross-section in the venire has been violated. *Duren v. Missouri*, 439 U.S. 357, 364, 58 L. Ed. 2d 579, 587 (1979). In order to establish a *prima facie* case of disproportionate representation of a defendant's race in a venire, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Id.* In its brief to this Court, the State does not dispute that the first prong of the *Duren* test for establishing a *prima facie* case of disproportionate representation has been satisfied. The issue is whether defendant has satisfied the second and third prongs of the test. For the following reasons, we conclude that defendant has failed to establish his *prima facie* case.

The second prong of the *Duren* test calls for a determination as to whether the representation of African-Americans in the venire is fair and reasonable. In *State v. Price*, 301 N.C. 437, 447, 272 S.E.2d 103, 110 (1980), this Court considered data which was similar to the data set forth in the case at bar. The evidence in *Price* showed that African-Americans made up 17.1% of the jury pool, while the county's population was 31.1% African-American. *Id.* The absolute disparity was 14%. *Id.* Upon reviewing that data, this Court stated: "[W]e are unable to conclude as a matter of law that the applicable percentages are sufficient to establish that the representation of [African-Americans] is not fair and reasonable in light of their presence in the community." *Id.*

In the present case, it is disputed whether the disparity amounts to 14.8% or 16.17%. Even if we consider only defendant's data, a disparity of 16.17%, we cannot conclude that this figure, standing alone, is unfair or unreasonable. "[A] criminal defendant is not entitled to a jury of any particular composition, nor is he entitled to be tried before a jury which mirrors the presence of various and distinctive groups within the community." *Id.* at 448, 272 S.E.2d at 110-11. *See Apodaca v. Oregon*, 406 U.S. 404, 32 L. Ed. 2d 184 (1972). "[T]he right to trial by jury carries with it the right to be tried before a body which is selected in such a manner that competing and divergent interests and perspectives in the community are reflected rather than

reproduced absolutely." *Id. See Taylor v. Louisiana,* 419 U.S. 522, 42 L. Ed. 2d 690 (1975).

Defendant argues that the United States Supreme Court ruled that a 23% absolute disparity between the percentage of African-Americans in the venire and the general population established a *prima facie* case of discrimination. *Turner v. Fouche,* 396 U.S. 346, 24 L. Ed. 2d 567 (1970). However, in that decision, the United States Supreme Court did not conclude that the *prima facie* case was solely based upon the disparity of representation of African-Americans in the jury venire. Rather, that Court's conclusion ultimately rested upon the finding that the underrepresentation was the result of the systematic exclusion of African-Americans in the jury-selection process. *Id.* at 360, 24 L. Ed. 2d at 579. Under our interpretation of *Turner,* merely showing a disparity under the second prong of the *Duren* test, standing alone, will not establish a *prima facie* case of disproportionate representation.

With respect to the third prong of the *Duren* analysis, defendant in the case *sub judice* has failed to present any evidence showing that the jury-selection process was tainted by the systematic exclusion of African-Americans from the jury pool. This Court has held:

"[T]he fact that a particular jury or a series of juries does not statistically reflect the racial composition of the community does not in itself make out an invidious discrimination forbidden by the [Equal Protection] Clause."

*State v. Avery,* 299 N.C. 126, 130, 261 S.E.2d 803, 806 (1980) (quoting *Washington v. Davis,* 426 U.S. 229, 239, 48 L. Ed. 2d 597, 607 (1976)). Defendant's only evidence in the instant case consisted of the statistical makeup of this particular jury venire. Statistics concerning one jury pool, standing alone, are insufficient to meet the third prong of *Duren. Avery,* 299 N.C. at 130-31, 261 S.E.2d at 806. We must overrule this assignment of error.

[2] In his next assignment of error, defendant contends that the trial court erred in allowing the State's challenge for cause of prospective juror Mercedes Morris, who indicated that she might have difficulty voting in favor of a death sentence. We do not agree.

In order to determine whether a prospective juror may be excused for cause due to that juror's views on capital punishment, the trial court must consider whether those views would "prevent or substantially impair the performance of his duties as a juror in

accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985). At the outset of *voir dire*, the trial court explained North Carolina's capital sentencing law to the venire. The trial court then asked whether any of the prospective jurors had personal views which would prevent or substantially impair their ability to serve as a juror and to fairly consider both punishments. At that point, Morris indicated that she would have difficulty voting for the death penalty.

During *voir dire*, the prosecutor questioned Morris in order to further explore her feelings concerning the death penalty. The prosecutor asked:

Q. Do you feel, Ms. Morris, that your own personal beliefs, whether they be religious beliefs, personal beliefs, or moral beliefs, are such that it would prevent you from considering a death penalty in this case?

A. I think so.

Q. Okay. When you say you think so, can you tell me what you mean by that, Ms. Morris?

A. I don't think I would be able to do it because of conscience. I don't think it would be so easy for me to get over.

Q. Yes, Ma'am. So do you feel like, Ms. Morris, that—and, again, there are no right or wrong answers, okay?—Your own personal beliefs are such that you could not consider a sentence of death in this case?

A. I couldn't consider it.

Morris then indicated that she could not recommend a death sentence for defendant. At that point, the prosecutor challenged Morris for cause, and defendant was then permitted to question Morris. Defendant asked Morris whether she would be able to consider both punishments if the State proved defendant guilty of first-degree murder beyond a reasonable doubt. Morris replied that she could. The trial court then clarified that if defendant was convicted of first-degree murder, the jury could recommend only a sentence of death or a sentence of life imprisonment. Morris responded that she understood and indicated that she could fairly consider both alternative sentences.

STATE v. BOWMAN

[349 N.C. 459 (1998)]

In view of these answers, the trial court inquired further of Morris as follows:

THE COURT: All right. I gather then, Ms. Morris, what you're telling us is that you don't have any real personal opposition to the death penalty law—

A. No.

THE COURT: —But you, as an individual, because of your own personal views, don't want to be put in the position of imposing a death penalty—

A. That's right.

THE COURT: —or recommending it to the court?

A. (Nods head up and down.)

The trial court then allowed the prosecutor's for-cause challenge, finding that Morris' views concerning the death penalty would prevent or substantially impair her performance as a juror.

The decision " '[w]hether to allow a challenge for cause in jury selection is . . . ordinarily left to the sound discretion of the trial court which will not be reversed on appeal except for abuse of discretion.' " *State v. Stephens*, 347 N.C. 352, 365, 493 S.E.2d 435, 443 (1997) (quoting *State v. Locklear*, 331 N.C. 239, 247, 415 S.E.2d 726, 731 (1992)), *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 66 (1998). This Court has previously noted that "a prospective juror's bias for or against the death penalty cannot always be proven with unmistakable clarity." *State v. Miller*, 339 N.C. 663, 679, 455 S.E.2d 137, 145, *cert. denied*, 516 U.S. 893, 133 L. Ed. 2d 169 (1995). Therefore, we must defer to the trial court's judgment as to whether the prospective juror could impartially follow the law. *Id.*

In the present case, Morris clearly stated that she felt her personal beliefs might affect her consideration of the death penalty for defendant. Morris' responses were at best equivocal, in comparison, and the trial court gave ample opportunity to both sides to explore and elicit Morris' views. Absent an abuse of discretion, it is the trial court's decision as to whether this prospective juror's beliefs would affect her performance as a juror. *State v. Hoffman*, 349 N.C. 167, 175-76, 505 S.E.2d 80, 85 (1998). In light of the questioning and responses here, we cannot conclude that the trial court abused its

discretion by excusing prospective juror Morris. This assignment of error is overruled.

[3] By his next assignment of error, defendant contends that the trial court erred in failing to grant a mistrial because the prosecutor repeatedly asked the State's witnesses leading questions and because the State's witnesses also made several impermissible and prejudicial statements. However, while defendant offered objections, he failed to make any motion for a mistrial. Our consideration of this assignment of error is therefore limited to whether the trial court should have ordered a mistrial *ex mero moto*.

This Court has repeatedly held that the decision " 'to grant a motion for mistrial is within the sound discretion of the trial court and its ruling will not be disturbed on appeal unless it is so clearly erroneous as to amount' to a manifest abuse of discretion.' " *State v. Sanders*, 347 N.C. 587, 595, 496 S.E.2d 568, 573 (1998) (quoting *State v. McCarver*, 341 N.C. 364, 383, 462 S.E.2d 25, 35 (1995), *cert. denied*, 517 U.S. 1110, 134 L. Ed. 2d 482 (1996)). It is appropriate for a trial court to declare a mistrial " 'only when there are such serious improprieties as would make it impossible to attain a fair and impartial verdict under the law.' " *State v. Norwood*, 344 N.C. 511, 537-38, 476 S.E.2d 349, 361 (1996) (quoting *State v. Calloway*, 305 N.C. 747, 754, 291 S.E.2d 622, 627 (1982)), *cert. denied*, 520 U.S. 1158, 137 L. Ed. 2d 500 (1997).

A review of the record reveals that the trial court sustained defendant's objections and issued curative instructions. "This Court presumes that jurors follow the trial court's instructions." *Norwood*, 344 N.C. at 537, 476 S.E.2d at 361. After a careful reading of the record, we cannot conclude that the prosecutor's questions or the statements complained of, or their cumulative effect, amounted to such serious impropriety that it was impossible for defendant to obtain a fair trial. *Id.* The trial court therefore did not abuse its discretion in failing to declare a mistrial *ex mero motu*. This assignment of error is overruled.

[4] In his next assignment of error, defendant contends that the trial court committed reversible error in instructing the jury on defendant's right not to testify when defendant did not request such an instruction. This Court has consistently held that while it is the better practice not to give an instruction on a defendant's failure to testify absent a request to do so, giving such an instruction does not constitute prejudicial error. *State v. Cunningham*, 344 N.C. 341, 362,

474 S.E.2d 772, 782 (1996); *State v. McDowell*, 301 N.C. 279, 293, 271 S.E.2d 286, 295 (1980), *cert. denied*, 450 U.S. 1025, 68 L. Ed. 2d 220 (1981). This assignment of error is overruled.

[5] Defendant's next assignment of error addresses the trial court's failure to control asserted inflammatory argument by the prosecutor during the guilt and penalty phases of defendant's trial. Defendant contends that the prosecutor took a "cheap shot" at defense counsel during the guilt-phase closing argument. The prosecutor argued:

> And, again, I would ask for you to listen to what the judge defines to you in regards to what reasonable doubt means, because reasonable doubt is a doubt based on reason and common sense. And reasonable doubt arises from the evidence, all the evidence, not one part of it. And reasonable doubt is not created or manufactured by lawyers getting up here and arguing to you and trying to do those lawyer trick things.

Defendant objected to this argument, and the trial court overruled the objection. Defendant argues that this comment amounts to prosecutorial misconduct, which deprived defendant of his right to a fair trial. We do not agree.

This Court has held that "[a]rguments of counsel are left largely to the control and discretion of the trial judge, and counsel is allowed wide latitude in the argument of hotly contested cases." *State v. Robinson*, 346 N.C. 586, 606, 488 S.E.2d 174, 187 (1997). However, "a trial attorney may not make uncomplimentary comments about opposing counsel, and should 'refrain from abusive, vituperative, and opprobrious language, or from indulging in invectives.' " *State v. Sanderson*, 336 N.C. 1, 10, 442 S.E.2d 33, 39 (1994) (quoting *State v. Miller*, 271 N.C. 646, 659, 157 S.E.2d 335, 346 (1967)). In evaluating counsel's comments, "remarks are to be viewed in the context in which they are made and the overall factual circumstances to which they referred." *Robinson*, 346 N.C. at 606, 488 S.E.2d at 187.

In the present case, the prosecutor's comment that "reasonable doubt is not created or manufactured by lawyers getting up here and arguing to you and trying to do those lawyer trick things" is not directed clearly and specifically toward the defense counsel in this case, but rather would seem more logically to reference lawyers in general. However, to the extent that it could be considered a comment directed against opposing counsel, the prosecutor did not use "abusive, vituperative, or opprobrious language." *State v. Holden*, 346

N.C. 404, 432, 488 S.E.2d 514, 529 (1997), *cert. denied,* —— U.S. ——, 140 L. Ed. 2d 132 (1998). This statement was also an isolated comment and not a repeated attempt to "diminish defense counsel before the jury." *Id.* We therefore conclude that this one reference to defense lawyers generally, or perhaps to defendant's counsel particularly, did not amount to misconduct so improper as to deprive defendant of his due process right to a fair trial.

**[6]** Defendant next assigns error to the trial court's sustaining the prosecutor's objection to defense counsel's definition of reasonable doubt. During the guilt-phase closing arguments, defense counsel offered the following definition of reasonable doubt:

> [W]hen it is said that the jury must be satisfied of the defendant's guilt beyond a reasonable doubt, it is meant that [it] must be fully satisfied or satisfied to a moral certainty of the truth of the charges.
>
> If after considering, comparing, and weighing all the evidence the minds of the jurors are left in such condition that they cannot say that they have an abiding faith to a moral certainty in the defendant's guilt, then they have a reasonable doubt, otherwise not.

At the close of this argument, the trial court excused the jury and then told defense counsel that this explanation of reasonable doubt may not "accurately reflect the law." The trial court recommended that in their final argument, defense counsel might wish to clarify for the jurors that "they must be convinced only to an evidentiary certainty [of defendant's guilt]," rather than to a "moral certainty."

Then, during defendant's final closing argument to the jury, the following transpired:

> Now, his Honor is going to instruct you as to what is a reasonable doubt. A reasonable doubt is an evidentiary standard. And I would contend to you that a shorthand way of saying it, not the legal definition, but a shorthand way is basically if you can look in the mirror after you make a decision.
>
> [PROSECUTOR]: Objection, your Honor.
>
> THE COURT: Sustained. Do not argue that, please.
>
> [DEFENSE COUNSEL]: Yes, sir.

Defendant contends that defense counsel was denied the opportunity to argue its conception of reasonable doubt to the jury, which resulted in depriving defendant of effective assistance of counsel. We disagree.

The United States Supreme Court has held that jury instructions which explain reasonable doubt with "moral certainty" language are permissible so long as the jurors are also explicitly told "that their conclusion had to be based on the evidence in the case." *Victor v. Nebraska*, 511 U.S. 1, 16, 127 L. Ed. 2d 583, 596-97 (1994). In this case, defense counsel knew from the trial court's admonition that any references to "moral certainty" in the context of explaining or defining reasonable doubt could not be disassociated from the evidence. However, defense counsel nevertheless argued that reasonable doubt could be measured by whether a juror "could look in the mirror" after reaching a decision, thus in effect obviating the evidentiary standard. Considering the context in which this argument was made, defense counsel's statement served to reassert the concept of moral conscience and to disassociate this from the sufficiency of the evidence. Since the trial court had previously instructed defense counsel not to define reasonable doubt with moral certainty language, the trial court did not err by sustaining the prosecutor's objection to this portion of defendant's argument. *State v. Warren*, 348 N.C. 80, 105, 499 S.E.2d 431, 445, *cert. denied*, —— U.S. ——, 142 L. Ed. 2d 216 (1998).

Assuming *arguendo* that the trial court did err in sustaining the prosecutor's objection, this error was cured because the trial court thereafter correctly instructed the jury as to reasonable doubt in accordance with the pattern jury instruction, N.C.P.I.—Crim. 101.10 (1974). *Warren*, 348 N.C. at 106, 499 S.E.2d at 445. We conclude that this assignment of error is without merit.

[7] In his next assignment of error, defendant contends that he is entitled to a new trial since the trial court allowed the bailiff to interject his interpretation of a written question submitted to the trial court by the jury after deliberations had begun. During guilt-phase deliberations, the trial court received a written inquiry from the jury seeking an explanation of "exactly what premeditation means." The trial court discussed the jury's request with counsel, and the bailiff asked if he might address the court. The trial court gave the bailiff permission to speak, and the following colloquy occurred:

**STATE v. BOWMAN**

[349 N.C. 459 (1998)]

> BAILIFF: What they really wanted to know is if there's a time limit on premeditation.

> THE COURT: If there was a time limit?

> BAILIFF: Yes. If it had to be premeditated ten minutes, an hour, or so forth. That was what they wanted to find out.

The trial court informed counsel that he would respond to the jury's question by repeating only the relevant portions of his jury charge. Defendant then requested the trial court to read all the elements of first- and second-degree murder to the jurors. The trial court declined, stating, "that's not the subject of their question."

Before the trial court directly answered the jury's question, the trial court sought to clarify the jury's concern:

> Ladies and gentlemen of the jury, the bailiff has informed me that you had a question on some of the law that I instructed you about. I asked you to have it reduced to writing. He handed me a slip of paper. It says the jury wants to know exactly what premeditation means and explain.

> I want to inquire: Is that the question?

> A. Yes, sir. (In unison.)

> THE COURT: All of you agree that that's the question.

> A. Yes, sir. (In unison.)

> THE COURT: All right. I'm going to go over with you the instructions that I gave you earlier with regard to premeditation and deliberation. And I'm going to try to [flesh] out for you only briefly the time element for premeditation and deliberation. I assume that was your concern; is that correct?

> A. Yes, sir. (In unison.)

After the trial court was satisfied it understood the jury's concern, the trial court repeated its previous instructions concerning premeditation and deliberation. In addition to these instructions, the trial court stated:

> Now, there is no specific time element required for the formation of the intent to kill, not in hours, not in minutes, not in seconds. The requirement is that he acted after premeditation;

that is, he formed the intent to kill the victim over some period of time, however short, before he acted.

Defendant now contends that he is entitled to a new trial because the trial court failed to answer the jury's question as written, and instead only answered the question that the bailiff claimed the jurors intended to ask. We do not agree.

The record reveals that the trial court did not rely exclusively on the bailiff's explanation in responding to the jury's written question. The trial court personally addressed the jury in order to confirm that it wanted to know "what premeditation means." The trial court then continued its inquiry in order to confirm that the jury's main concern related to time limits associated with premeditation. Only after the trial court was satisfied that it correctly understood the jury's question did the trial court proceed with its instructions. There is nothing in the record to indicate that the trial court addressed only the bailiff's interpretation and ignored the jurors' written inquiry. This assignment of error is overruled.

[8] In his next assignment of error, defendant contends that the trial court erred in admitting victim-impact evidence at the penalty phase of defendant's trial. The prosecutor examined Letha Marie Jones and Sabrina Joan Pugh, the mothers of each of defendant's victims. Defendant failed to object when each of these witnesses testified as to how their sons' murders affected them and their families. Since defendant failed to object during the victims' mothers' testimony, we must limit our review to whether admission of this victim-impact evidence constitutes plain error. *State v. Moody*, 345 N.C. 563, 572, 481 S.E.2d 629, 633, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 125 (1997). "In order to prevail under a plain error analysis, defendant must establish not only that the trial court committed error, but that 'absent the error, the jury probably would have reached a different result.'" *State v. Sierra*, 335 N.C. 753, 761, 440 S.E.2d 791, 796 (1994) (quoting *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993)).

The United States Supreme Court has held that a victim-impact statement may be admitted during a capital sentencing proceeding unless that evidence "is so unduly prejudicial that it renders the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825, 115 L. Ed. 2d 720, 735 (1991). In addition, this Court has stated that "the State should be given some latitude in fleshing out the humanity of the victim so long as it does not go too far." *State v. Reeves*, 337 N.C.

700, 723, 448 S.E.2d 802, 812 (1994), *cert. denied*, 514 U.S. 1114, 131 L. Ed. 2d 860 (1995). Defendant points out that the key to this Court's approval of victim-impact evidence in recent cases is the *de minimus* nature of that evidence. In contrast to those prior cases, defendant argues that in the instant case the State made the victim-impact evidence the "centerpiece" of its sentencing-phase presentation. Defendant contends that he is thus entitled to a new sentencing proceeding. We disagree.

There is no evidence in the record which suggests that the jury based its decision for the death penalty on this victim-impact evidence. The sole aggravating circumstance that the prosecution submitted and the jury found was that defendant committed the murders as part of a course of conduct in committing another crime of violence. N.C.G.S. § 15A-2000(e)(11) (1997). Nowhere in his closing argument did the prosecutor argue for the jury to impose the death penalty based on the impact the murders had on the victims' families. Therefore, we cannot conclude that this evidence served any purpose other than " 'to remind the jury that the victims were sentient beings with close family ties before they were murdered by defendant.' " *State v. Bond*, 345 N.C. 1, 37, 478 S.E.2d 163, 182 (1996) (quoting *State v. Conaway*, 339 N.C. 487, 528, 453 S.E.2d 824, 850, *cert. denied*, 516 U.S. 884, 133 L. Ed. 2d 153 (1995)), *cert. denied*, —— U.S. ——, 138 L. Ed. 2d 1022 (1997).

[9] Defendant also argues that the trial court increased the severity of the victim-impact evidence when it precluded defendant from questioning the victims' mothers about their feelings toward the death sentences in this case. During the cross-examination of Mrs. Pugh, defense counsel asked if she had any feelings about the death penalty in this case. The State objected to this question, and the trial court sustained the objection. Outside of the jury's presence, defendant made an offer of proof showing that Mrs. Pugh had conflicting feelings as to punishment. During *voir dire*, Mrs. Pugh stated that she wanted to see defendant "lose his life the same way he took my son's life." Mrs. Pugh then went on to explain:

[B]ut before that, I want him to be able to tell me why he took my son's life. And I want him to tell his two-year-old daughter why she's never going to see her daddy again, because every night she's asking me to see her daddy. And there's no way I can tell this two-year-old why she's never going to see her daddy again.

STATE v. BOWMAN

[349 N.C. 459 (1998)]

Defendant argues that the trial court should have admitted this portion of Mrs. Pugh's testimony into evidence since it constitutes a reason as to why defendant should be sentenced to life imprisonment instead of death. Defendant further contends that since Mrs. Pugh's statement offers a reason as to why defendant should be sentenced to life imprisonment, then it falls within the definition of "mitigating circumstance." Thus, defendant asserts, the trial court erred in excluding evidence that could mitigate defendant's sentence. This argument is without merit.

The United States Supreme Court has held that a jury should "not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 57 L. Ed. 2d 973, 990 (1978). The Supreme Court also noted that this rule was not intended to "limit[] the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 604 n.12, 57 L. Ed. 2d at 990 n.12. We have adopted the Supreme Court's rule, and we have also stated that a mitigating circumstance may be defined as "a fact or group of facts . . . which may be considered as extenuating, or reducing the moral culpability of the killing, or making it less deserving of the extreme punishment than other first-degree murders." *State v. Irwin*, 304 N.C. 93, 104, 282 S.E.2d 439, 446-47 (1981).

In the instant case, defendant contends that a victim's mother's opinion as to whether defendant should receive a sentence of death should come within the definition of "mitigating circumstance." However, this evidence has no bearing as to "defendant's character, prior record, or the circumstances of his offense." *Lockett*, 438 U.S. at 604 n.12, 57 L. Ed. 2d at 990 n.12; *Bond*, 345 N.C. at 33, 478 S.E.2d at 180. It also fails to reduce the "moral culpability of the killing." *Irwin*, 304 N.C. at 104, 282 S.E.2d at 446-47. We cannot conclude that Mrs. Pugh's statement constituted mitigating evidence or that it could be fairly construed as offering a reason why defendant should be sentenced to life imprisonment instead of death. We therefore conclude that the trial court did not err in excluding this evidence. This assignment of error is overruled.

[10] In his final assignment of error, defendant asserts that the trial court erred in the capital sentencing proceeding by allowing the prosecution to cross-examine him concerning the fact that he was on

parole from a conviction in New York at the time he committed the murders in the instant case. Defendant asserts that, as a result, the prosecutor improperly injected the issue of parole in the sentencing proceeding. However, during cross-examination, defendant failed to object to the prosecutor's questions which he now contends were improper. We must therefore determine whether the prosecution's questions constituted plain error. *Sierra*, 335 N.C. at 761, 440 S.E.2d at 796.

The record reveals that on direct examination defendant testified about his prior convictions for selling drugs and his early release on parole. Thus, defendant effectively opened the door to cross-examination on these issues. *State v. Warren*, 347 N.C. 309, 317, 492 S.E.2d 609, 613 (1997), *cert. denied*, —— U.S. ——, 140 L. Ed. 2d 818 (1998). In addition, there is no evidence suggesting that the prosecutor attempted to connect defendant's prior record to improper parole considerations with respect to sentencing. *Conaway*, 339 N.C. at 522, 453 S.E.2d at 846. Defendant has failed to show that a different result would have occurred had the trial court acted *ex mero motu* and prohibited the prosecution's cross-examination regarding his prior criminal record. We therefore conclude that the trial court did not err in failing to intervene during defendant's cross-examination. This assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises two additional issues which he concedes have been previously decided contrary to his position by this Court: (1) the trial court erred in instructing the jury that it could reject a submitted nonstatutory mitigating circumstance if it found that circumstance not to have mitigating value; and (2) the trial court erred in its penalty-phase charge to the jury by instructing that it may, rather than must, consider any mitigating circumstances that the jury determines to exist in weighing the aggravating and mitigating circumstances in Issues III and IV on the verdict sheet.

Defendant raises these issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving them for possible further judicial review of this case. We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

PROPORTIONALITY REVIEW

[11] Having concluded that defendant's trial and capital sentencing proceeding were free from prejudicial error, we must now review the record and determine as to each murder: (1) whether the evidence supports the aggravating circumstance found by the jury; (2) whether the sentence was entered under the influence of passion, prejudice or any other arbitrary factor; and (3) whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). We have thoroughly reviewed the record, transcript and briefs in this case. We conclude that the record fully supports the aggravating circumstance found by the jury. Further, we find no indication that the sentences of death in this case were imposed under the influence of passion, prejudice or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

[12] In the present case, defendant was found guilty of two counts of murder under the theory of premeditation and deliberation. Following a capital sentencing proceeding, the jury found the one aggravating circumstance submitted as to each murder: that "[t]he murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11).

The trial court submitted, and the jury found, as to each murder, the statutory mitigating circumstance that defendant had no significant history of prior criminal activity. N.C.G.S. § 15A-2000(f)(1). The trial court also submitted the statutory "catchall" circumstance, but the jury did not find "[a]ny other circumstance arising from the evidence which the jury deems to have mitigating value." N.C.G.S. § 15A-2000(f)(9). Of the twenty-three nonstatutory mitigating circumstances submitted as to each murder, the jury found two to exist.

One purpose of our proportionality review is to "eliminate the possibility that a sentence of death was imposed by the action of an aberrant jury." *State v. Lee*, 335 N.C. 244, 294, 439 S.E.2d 547, 573, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). In conducting proportionality review, we compare the present case with other cases in which this Court has concluded that the death penalty

**STATE v. BOWMAN**

[349 N.C. 459 (1998)]

was disproportionate. *State v. McCollum*, 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). This Court has found the death penalty disproportionate in seven cases: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. First, defendant was convicted of two counts of first-degree murder. This Court has never found a sentence of death disproportionate in a case where the jury has found defendant guilty of murdering more than one victim. *State v. Goode*, 341 N.C. 513, 552, 461 S.E.2d 631, 654 (1995). In addition, the jury convicted defendant under the theory of premeditation and deliberation. This Court has stated that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Finally, the jury found the only aggravating circumstance submitted: "The murder for which the defendant stands convicted was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11). There are four statutory aggravating circumstances which, standing alone, this Court has held sufficient to support a sentence of death. *State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). The (e)(11) circumstance, which the jury found here, is among them. *Id.*

It is also proper for this Court to "compare this case with the cases in which we have found the death penalty to be proportionate." *McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although this Court reviews all of the cases in the pool when engaging in our duty of proportionality review, we have repeatedly stated that "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* It suffices to say here that we conclude the present

case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence of death disproportionate or to those in which juries have consistently returned recommendations of life imprisonment.

Finally, this Court has noted that similarity of cases is not the last word on the subject of proportionality. *State v. Daniels*, 337 N.C. 243, 287, 446 S.E.2d 298, 325 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). Similarity "merely serves as an initial point of inquiry." *Id.* Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

Based on the foregoing and the entire record in this case, we cannot conclude as a matter of law that the sentences of death were excessive or disproportionate. We hold that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.