STATE OF NORTH CAROLINA v. ROWLAND ANDREW HEDGEPETH

No. 578A97

(Filed 20 August 1999)

## 1. Evidence— capital sentencing—prior violent outbursts and assaults—rebuttal of character and mitigating evidence

The trial court did not err by permitting the State to rebut evidence of defendant's good character in a capital sentencing proceeding by evidence of defendant's prior violent outbursts and assaultive behavior. Furthermore, testimony by the victims of these violent outbursts and assaults regarding the circumstances of these incidents, which occurred prior to the time defendant received a brain injury in a 1976 fall, was admissible to rebut defendant's mitigating evidence that a personality disorder he had prior to 1976 was exacerbated by the 1976 fall and brain injury and that defendant's lack of control of his emotions resulting from the fall contributed to his shooting of the victim.

## 2. Evidence— capital sentencing—mental health testimony— exclusion on redirect—same as direct evidence—harmless error

Any error by the trial court in excluding in this capital sentencing proceeding redirect testimony by defendant's mental health expert that linked defendant's personality disorder and brain damage to his killing of the victim was not prejudicial to defendant where this testimony was essentially the same as testimony previously elicited through the direct examination of this witness and testimony previously elicited from a second mental health expert.

**3. Sentencing— capital sentencing—mitigating circumstances—peremptory instructions not required**

The trial court did not err in refusing to give defendant's requested peremptory instruction in a capital sentencing proceeding on the (f)(2) mitigating circumstance that the murder was committed while defendant was under the influence of a mental or emotional disturbance or the (f)(6) mitigating circumstance that defendant's ability to conform his conduct to the requirements of the law was impaired where evidence of defendant's mental health experts supporting these mitigating circumstances was controverted by the State's evidence tending to show that defendant's shooting of the victim was planned in advance and that defendant was cold, calm, and calculated in carrying out his plan. N.C.G.S. § 15A-2000(f)(2), (f)(6).

**4. Sentencing— capital sentencing—instructions—distinction between statutory and nonstatutory mitigating circumstances**

The trial court's instructions in a capital sentencing proceeding properly distinguished between statutory and nonstatutory mitigating circumstances, although the court did not specifically instruct that the jurors must give weight to statutory mitigating circumstances, where the trial court properly informed the jurors that, in order to find the existence of a statutory mitigating circumstance, one or more jurors must find that the circumstance is supported by a preponderance of the evidence, and that in order to find the existence of a nonstatutory mitigating circumstance, one or more jurors must (1) find by a preponderance of the evidence that the circumstance exists, and (2) find that the circumstance has mitigating value.

**5. Evidence— lay opinion—victim alive after shooting**

A lay opinion by a restaurant customer that he thought the victim was alive when he was wheeled out of the restaurant after being shot by defendant was properly admitted in this capital sentencing proceeding since it was an inference rationally based upon the perception of the witness and helped to clarify his testimony.

STATE v. HEDGEPETH

[350 N.C. 776 (1999)]

**6. Jury— capital sentencing—jury selection—preference for death penalty—ability to follow law—denial of challenge for cause**

The trial court did not abuse its discretion in denying defendant's challenge for cause of a prospective juror in a capital resentencing proceeding whose questionnaire responses and some of her responses on voir dire indicated that she preferred the death penalty for those convicted of murder where the trial court was able upon further questioning to discern that she was capable of putting aside her personal preference for the death penalty and of following the law.

**7. Jury— capital sentencing—jury selection—difficulty finding mitigating circumstance—denial of challenge for cause**

The trial court did not abuse its discretion in denying defendant's challenge for cause of a prospective juror in a capital resentencing proceeding who stated on voir dire that he would find it difficult to find a mitigating circumstance for a premeditated first-degree murder and indicated during questioning by the trial court that he was not certain that he could be fair and impartial where, upon further questioning by the trial court, the juror indicated that he could fairly and impartially apply the law, consider the evidence, and render a recommendation based on the evidence presented and the law as instructed by the trial court.

**8. Jury— capital sentencing—jury selection—brain tumor—memory loss—denial of challenge for cause**

The trial court did not abuse its discretion in denying defendant's challenge for cause of a prospective juror in a capital resentencing proceeding who suffered from short-term memory loss as a result of an inoperable brain tumor where the trial court determined the brain tumor and consequent memory loss had not interfered with the juror's full-time job as a loan officer and office supervisor and that note-taking during the trial would likely compensate for any impairment of his memory.

**9. Jury— capital sentencing—jury selection—inability to return death penalty—excusal for cause**

The trial court in a capital resentencing proceeding did not abuse its discretion by allowing the prosecutor's challenges for cause of two prospective jurors where the first juror's responses during voir dire strongly indicated his potential inability to con-

sider the death penalty, the second juror's responses revealed a complete unwillingness to impose the death penalty, and the trial court reasonably found that the personal views of both jurors would substantially impair their performance as jurors.

## 10. Capital sentencing— death penalty not disproportionate

Imposition of the death penalty on defendant for first-degree murder was not excessive or disproportionate where defendant was convicted on the theory of premeditation and deliberation; the jury found the aggravating circumstance that the murder of the victim was part of a course of conduct in which defendant engaged and which included another violent crime, the shooting of his estranged wife; defendant intended to kill both the victim and his estranged wife; a statement made by defendant at the police station indicated that his only regret was that he did not succeed in killing his estranged wife; and the course of conduct aggravating circumstance has been held sufficient, standing alone, to support a sentence of death.

Appeal as of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Smith (W. Osmond, III), J., at a new capital sentencing proceeding held at the 19 May 1997 Criminal Session of Superior Court, Halifax County, upon defendant's conviction of first-degree murder. Heard in the Supreme Court 11 May 1999.

*Michael F. Easley, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Thomas K. Maher for defendant-appellant.*

ORR, Justice.

On 23 February 1987, defendant Rowland Andrew Hedgepeth was indicted for the first-degree murder of Richard Casey and for assault with a deadly weapon with intent to kill inflicting serious injury on Beverly Hedgepeth, defendant's estranged wife. In October of 1987, defendant was tried capitally to a jury and found guilty. After a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction, and the trial judge entered judgment accordingly. On appeal, we affirmed the murder conviction but found reversible error in the sentencing proceeding under *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990). Accordingly, we vacated the sentence of death and remanded for a new capital

sentencing proceeding. *State v. Hedgepeth*, 330 N.C. 38, 409 S.E.2d 309 (1991).

The new capital sentencing proceeding was held at the 19 May 1997 Criminal Session of Superior Court, Halifax County. The jury found the aggravating circumstance that the murder was part of a course of conduct in which defendant engaged, including defendant's commission of other crimes of violence against another person or persons. N.C.G.S. § 15A-2000(e)(11) (1997). The jury also found the statutory mitigating circumstance that the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2), and seven nonstatutory mitigating circumstances. After determining that the aggravating circumstance found outweighed the mitigating circumstances found and that it was sufficiently substantial to call for imposition of the death penalty, the jury recommended a sentence of death for the first-degree murder conviction, and the trial judge entered judgment accordingly.

Defendant appeals as of right from the sentence of death. After thorough consideration of the assignments of error brought forth on appeal by defendant, the transcript of the proceeding, the record on appeal, the briefs, and oral arguments, we hold that defendant received a fair capital sentencing proceeding, free from prejudicial error, and that the sentence of death is not disproportionate.

Because the facts were presented fully in our earlier opinion, *State v. Hedgepeth*, 330 N.C. 38, 409 S.E.2d 309, we restate them here only as necessary to address and determine the issues presented in this appeal. At the new sentencing hearing, the State presented evidence tending to show that Beverly Hedgepeth and defendant married in 1980 and separated in 1986. On 13 February 1987, Mrs. Hedgepeth; Richard Casey; Dennis Morgan; and Dennis Morgan's wife, Ruth Morgan, went to a Howard Johnson's restaurant for breakfast after attending a dance. At the time of the sentencing rehearing, Mrs. Hedgepeth had remarried. She is referred to as Ms. Jolly in the transcript. They were seated at a booth when defendant entered the restaurant and sat in a booth adjacent to theirs.

Because Mr. Morgan had noticed the handle of a gun sticking out from under defendant's coat as defendant entered the restaurant, he rose and sat in the booth with defendant. According to Mr. Morgan, defendant was angry and told Mr. Morgan, *inter alia*, that he loved Mrs. Hedgepeth; "that Ricky Casey had slept with every woman in

Roanoke Rapids" but would not sleep with Mrs. Hedgepeth that night; and that he was going to kill Casey, Mrs. Hedgepeth, and himself. In the course of their conversation, Mr. Morgan informed defendant that Mrs. Hedgepeth's first husband had raped a child and subsequently killed himself. Defendant became more upset because he had not previously been informed of this occurrence.

A short time later, defendant approached the booth where Mrs. Hedgepeth, Casey, and Mrs. Morgan sat and asked Casey to step outside the restaurant. After Casey told defendant that he did not want any trouble, defendant replied, "Let me show you trouble" or "this is trouble"; pulled out the gun; and fired several times, killing Casey and wounding Mrs. Hedgepeth.

The defense, in mitigation, presented evidence by defendant's brother Billy Hedgepeth, who testified about defendant's childhood. Billy testified, among other things, that defendant's parents raised three children, including Billy and defendant. For a time, both parents worked in a cotton mill. Later, defendant's father became a construction worker. Defendant's father was a "weekend drunk."

Billy Hedgepeth testified that in 1976 defendant fell from a three-story building and suffered head injuries. As a result, defendant was out of work for a year or more and was unable to return to his former position. From the late 1970s to the early 1980s, Billy and defendant worked at construction sites in Ashland, Virginia; Good Hope, Louisiana; and Georgetown, South Carolina. Defendant worked in Louisiana for six or seven months of the time he was married to Mrs. Hedgepeth and sent all his pay except what he needed to live on home to Mrs. Hedgepeth. Defendant had a good relationship with the son born of his union with Mrs. Hedgepeth and was supportive of Mrs. Hedgepeth's daughter from her previous marriage.

Dr. Joseph Neil Ortego, a board-certified psychiatrist and neurologist, testified based on his review of twelve reports of examinations of defendant, including school records and hospital records, and his two-hour evaluation of defendant. Dr. Ortego's testimony included his reading into the record a report prepared by him. In his report, Dr. Ortego concluded that defendant has a mixed personality disorder, is alcohol dependent and has permanent structural and functional brain damage as a result of the head injury. Dr. Ortega, reading from his report, testified that defendant's brain damage dramatically changed his degree of aggressiveness, rage, and inhibition when he was intoxicated, impairing his ability to control his emotions.

Dr. Ortego contrasted defendant's 1973 preinjury antisocial behavior when he had separated from his first wife with two incidents after the injury: defendant's behavior after he separated from Janis Hovis, a former girlfriend who once lived with him, and defendant's behavior on the night of 13 February 1987. In explaining defendant's behavior on the night of 13 February 1987, Dr. Ortego testified that "at the point when [defendant] was intoxicated and enraged his ability to appreciate the criminality and the consequences [of his actions was] very much impaired."

Dr. Helen Rogers, a clinical psychologist with a specialty in clinical neuropsychology, testified that she conducted a five-to six-hour neuropsychological evaluation that consisted of a battery of tests designed to gauge brain function. Dr. Rogers' evaluation of defendant indicated "impairment in memory, verbal memory performance and a variety of difficulties in areas that suggest frontal lobe damage." Dr. Rogers also reviewed other medical records of defendant's, including a report prepared by the North Carolina Department of Correction in 1980 and one prepared at Dorothea Dix Hospital in March 1987. Dr. Rogers further testified that a person with frontal lobe injury would be "more vulnerable to the effects of any kind of stress [including] chemical stressors like . . . alcohol."

The State presented rebuttal evidence tending to show the following:

Over defendant's objection, the State presented rebuttal evidence of defendant's prior bad acts. Defendant's first wife, Donna Rice, testified to incidences of defendant's abusive behavior towards her and her uncle, Clyde Hargrave. Rice testified that on one occasion, defendant struck her after forcing her to leave an evening program at the elementary school where she was employed.

Rice testified further that after she left defendant in June 1973, she moved in with her grandmother. When defendant called and announced that he was coming to get her, Rice summoned her uncle, Clyde Hargrave, to protect her. When Hargrave informed defendant that Rice did not wish to go with him, defendant struck Hargrave. After Hargrave obtained a warrant for defendant's arrest, defendant attacked him again.

Hargrave also testified to the June 1973 incident in which defendant assaulted him. Carlon Nicholson, another of Rice's uncles, testified that a week after the incident in which Hargrave was assaulted,

defendant appealed to him for help in getting Rice back. Nicholson testified that when he refused defendant's request for help, defendant struck him.

Vicky Proctor, a former girlfriend of defendant's, testified that prior to defendant's head injury, defendant once took her out of a van and assaulted her in the street. On another occasion, she sustained injuries when she jumped out of a moving car that defendant was driving after he began beating her.

Several witnesses testified to a 10 August 1979 incident in which defendant chased Janet Hovis, who had been living with defendant at the Henry Street Apartments for several months. Defendant then got into his car and drove towards two of his neighbors who were standing in front of some apartments. He drove over the curb and onto the cement steps of an apartment, pinning two people between his car and an apartment door. Defendant then got out of his car, grabbed one of the neighbors by her throat, threatening to kill her. He eventually got back into his car and left the scene.

[1] On appeal, defendant first argues that the trial court erred by allowing the State to introduce unfairly prejudicial evidence of prior bad acts committed by defendant. In mitigation, through the expert testimony of Drs. Rogers and Ortego and through the testimony of Billy Hedgepeth, defendant presented evidence that a personality disorder he had prior to 1976 was exacerbated by the brain injury he suffered in the 1976 fall and that defendant's lack of control of his emotions resulting from the fall contributed to the shooting. Defendant argues that because this evidence was not offered to show that defendant had been nonviolent prior to the fall and because defendant did not attempt to rely on good character as a mitigating circumstance, evidence of defendant's assaultive behavior was not permissible rebuttal under N.C.G.S. § 8C-1, Rule 404.

Defendant contends that evidence of his violent outbursts did not rebut mitigating evidence of his personality disorder and that evidence of his violent outburst in 1979 was not logically relevant in that it occurred after his head injury and, therefore, could not rebut defendant's evidence that his brain injury affected his impulse control and susceptibility to alcohol. Furthermore, he argues that the trial court's admission of extensive evidence of his violent acts was inflammatory and unfairly prejudicial and should have been excluded under Rule 403 of the North Carolina Rules of Evidence.

"Admissibility of evidence at a capital sentencing proceeding is not subject to a strict application of the rules of evidence, but depends on the reliability and relevance of the proffered evidence." *State v. Atkins*, 349 N.C. 62, 77, 505 S.E.2d 97, 107 (1998), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 67 U.S.L.W. 3732 (1999). Because the Rules of Evidence do not apply in capital sentencing proceedings, N.C.G.S. § 8C-1, Rule 1101(b)(3) (1992), "a trial court has great discretion to admit any evidence relevant to sentencing." *State v. Thomas*, 350 N.C. 315, 359, 514 S.E.2d 486, 513 (1999). "Any evidence that the trial court deems relevant to sentencing may be introduced in the sentencing proceeding." *State v. Perkins*, 345 N.C. 254, 283-84, 481 S.E.2d 25, 38, *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 64 (1997).

In *State v. Ward*, 338 N.C. 64, 449 S.E.2d 709 (1994), *cert. denied*, 514 U.S. 1134, 131 L. Ed. 2d 1013 (1995), we explained that in a capital sentencing proceeding,

> "the state may not in its case in chief offer evidence of defendant's bad character. A defendant, however, may offer evidence of whatever circumstances may reasonably be deemed to have mitigating value, whether or not they are listed in section (f) of the statute. Often this may be evidence of his good character. The state should be able to, and we hold it may, offer evidence tending to rebut the truth of any mitigating circumstance upon which defendant relies and which is supported by the evidence, including defendant's good character."

*Id.* at 120, 449 S.E.2d at 740 (quoting *State v. Silhan*, 302 N.C. 223, 273, 275 S.E.2d 450, 484 (1981), *overruled on other grounds by State v. Sanderson*, 346 N.C. 669, 488 S.E.2d 133 (1997)) (citation omitted).

Here, defendant proffered some evidence of his good character. Through Billy Hedgepeth's testimony particularly, a portrait emerged of defendant as a good father and stepfather and a devoted husband who worked hard, got along with his co-workers, and provided for his family. We conclude that the trial court did not abuse its discretion in allowing the State to rebut this evidence of defendant's good character.

The transcript reveals that the trial court conducted *voir dire* to determine the admissibility of the evidence to be presented by Donna Nicholson Rice, Clyde Hargrave, and Vicky Proctor and concluded

**STATE v. HEDGEPETH**

[350 N.C. 776 (1999)]

that the evidence was relevant and admissible rebuttal evidence. The trial court also conducted inquiry as to the admissibility of the testimony of several witnesses to the Hovis incident and concluded that their testimony was admissible. We also cannot conclude that the trial court abused its discretion in admitting evidence of defendant's prior violent outbursts to rebut the testimony in mitigation of Drs. Rogers and Ortego. Since their evidence attempted to explain the impact of defendant's brain injury on his assaultive behavior, evidence regarding the circumstances surrounding these incidents as testified to by the victims of this behavior was appropriate on rebuttal. This assignment of error is overruled.

Furthermore, in *State v. Williams*, 350 N.C. 1, 510 S.E.2d 626 (1999), we addressed a similar issue. In *Williams*, the defendant argued that the trial court erred in allowing details of his prior criminal activity into evidence in his capital sentencing proceeding. As we stated in *Williams*, "[o]nce any evidence is introduced in a capital sentencing proceeding tending to show a history of prior criminal activity by defendant, defendant and the State are free to present all evidence available concerning the extent and significance of that history." *Id.* at 12, 510 S.E.2d at 634. Certainly, as in *Williams*, once defendant in the case *sub judice* proffered evidence of his prior violent outbursts, the State was free to offer a more comprehensive account of that assaultive behavior. We, therefore, conclude that the trial court did not err in allowing the testimony at issue.

Rule 403 of the North Carolina Rules of Evidence provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C.G.S. § 8C-1, Rule 403 (1992). We have consistently noted that " '[n]ecessarily, evidence which is probative in the State's case will have a prejudicial effect on the defendant; the question is one of degree.' " *State v. Wilson*, 345 N.C. 119, 127, 478 S.E.2d 507, 512-13 (1996) (quoting *State v. Weathers*, 339 N.C. 441, 449, 451 S.E.2d 266, 270 (1994)). It is also well established that "the exclusion of evidence under the balancing test of Rule 403 . . . is within the trial court's sound discretion." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).

Here, the trial court found that the probative value of the evidence was not outweighed by the danger of unfair prejudice. We cannot conclude that the trial court abused its discretion in allowing evidence of defendant's prior violent acts, and we therefore reject defendant's contention that the probative value of the evidence of his prior violent acts was substantially outweighed by the danger of unfair prejudice under Rule 403.

[2] In his next assignment of error, defendant contends that the trial court erred in excluding expert testimony that linked defendant's personality disorder and brain damage to the killing of Casey. During redirect examination and outside the presence of the jury, the following exchange occurred between defense counsel and Dr. Rogers:

Q. Dr. Rogers, in your professional opinion did the defendant's brain damage contribute to his commission of the crime for which he's been convicted, that is, the murder of Richard Casey?

A. Yes.

Q. Excuse me?

A. Yes.

Q. And what is the basis for that opinion?

A. That a compromised brain particularly when matched with alcohol and under stress is much more likely to respond impulsively and not be able to inhibit reaction.

The State objected, arguing that the question of whether defendant's injury contributed to the commission of the crime called for a legal conclusion, and the trial court sustained the State's objection.

Defendant argues that because Dr. Roger's testimony explained the link between defendant's medical condition and the commission of the crime, it was relevant, mitigating evidence, and the trial court's refusal to admit it was constitutional error. In sustaining the objection, the trial court duly noted that the question was being asked on redirect and that the testimony had previously been elicited from the witness.

On redirect examination of a witness, "the calling party is ordinarily not permitted to . . . have the direct testimony repeated." *State v. Weeks*, 322 N.C. 152, 169, 367 S.E.2d 895, 905 (1988). Here, the testimony defendant attempted to elicit from Dr. Rogers is essentially

the same as testimony previously elicited through direct examination of Dr. Rogers and testimony previously elicited from Dr. Ortego. Even assuming *arguendo* that the trial court erred, any prejudice to defendant is not sufficient so as to entitle him to a new sentencing hearing.

[3] Defendant next contends that the trial court erred in refusing to give the requested peremptory instruction that the murder was committed while defendant was under the influence of a mental or emotional disturbance and that defendant's ability to conform his conduct to the requirements of the law was impaired as set forth in N.C.G.S. § 15A-2000(f)(2) and (f)(6), respectively. Even though the trial court refused to give the requested peremptory instruction on the (f)(2) mitigating circumstance that the murder was committed while defendant was under the influence of mental or emotional disturbance, one or more of the jurors still found it to exist; however, none of the jurors found the (f)(6) mitigator that defendant's ability to conform his conduct to the law was impaired.

Defendant argues that the facts in the instant case are similar to those in *State v. Holden*, 338 N.C. 394, 450 S.E.2d 878 (1994). In *Holden*, we held that the defendant was entitled to a new capital sentencing proceeding because the trial court refused to give a peremptory instruction to the jury on the (f)(2) mitigating circumstance despite the fact that the defendant presented uncontroverted evidence that the defendant suffered a mental or emotional disturbance at the time of the murder.

"[A] trial court should, if requested, give a peremptory instruction for any mitigating circumstance, whether statutory or nonstatutory, if it is supported by uncontroverted and manifestly credible evidence." *State v. Adams*, 347 N.C. 48, 70, 490 S.E.2d 220, 232 (1997), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 878 (1998). "If the evidence supporting the circumstance is controverted or is not manifestly credible, the trial court should not give the peremptory instruction." *State v. Bishop*, 343 N.C. 518, 557, 472 S.E.2d 842, 863 (1996), *cert. denied*, 519 U.S. 1097, 136 L. Ed. 2d 723 (1997). Furthermore, "[t]he trial court's refusal to give the peremptory instruction does not prevent defendant from presenting, or the jury from considering, any evidence in support of the mitigating circumstance." *Id.*

Here, defendant's evidence supporting the (f)(2) and (f)(6) mitigating circumstances was in fact controverted. Dr. Ortego and Dr. Rogers testified that the brain injury defendant suffered in the 1976

fall resulted in defendant's lack of control of his emotions when enraged and intoxicated, which contributed to the shooting. While the testimony of Dr. Ortego and Dr. Rogers supported the (f)(2) and (f)(6) mitigating circumstances, the State presented evidence to the contrary.

The State's evidence tended to show that the shooting of Casey and Mrs. Hedgepeth was planned in advance and that defendant was cold, calm, and calculated in carrying out his plan. There is evidence that he was neither enraged nor intoxicated at the time of the shooting. For example, after defendant informed Mr. Morgan that he intended to kill Casey and Mrs. Hedgepeth, Mr. Morgan suggested that defendant think about what he was doing. Defendant responded that "he had been thinking about it for several months or seven months." Defendant selectively shot only Casey and Mrs. Hedgepeth. Furthermore, Mrs. Hedgepeth testified that when defendant fired the first shot, his face looked calm and he did not appear to be intoxicated. Detective ·David Brown of the Roanoke Rapids Police Department, who apprehended defendant after the shooting, testified that defendant was not intoxicated.

In *State v. Neal*, 346 N.C. 608, 487 S.E.2d 734 (1997), *cert. denied,* —— U.S. ——, 140 L. Ed. 2d 131 (1998), we concluded that a peremptory instruction was inappropriate because the evidence surrounding the issue was conflicting. Because we conclude that the evidence as to the (f)(2) and (f)(6) mitigating circumstance was conflicting, we overrule this assignment of error.

**[4]** In his next assignment of error, defendant contends that the trial court committed plain error in not instructing the jurors that they must give weight to statutory mitigating circumstances and in leading the jurors to believe they could give no weight to statutory mitigating circumstances. Defendant argues that the trial court's instruction to the jurors that they were "the sole judges of the weight to be given to any individual circumstance . . . , whether aggravating or mitigating," along with the trial court's failure to inform the jurors that statutory mitigating circumstances must be given mitigating weight, deprived defendant of his constitutional right to have the jury give mitigating effect to the evidence of his mental and emotional disturbance and to his impaired capacity to conform his conduct to the requirements of the law.

"If a juror determines that a statutory mitigating circumstance exists, . . . the juror must give that circumstance mitigating value. The

General Assembly has determined as a matter of law that statutory mitigating circumstances have mitigating value." *State v. Jaynes*, 342 N.C. 249, 285, 464 S.E.2d 448, 470 (1995) (citations omitted), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996). In *State v. Howell*, 343 N.C. 229, 239, 470 S.E.2d 38, 43 (1996), we found reversible error where the jury was "thrice instructed . . . to decide whether any of the sixty-one mitigating circumstances had mitigating value."

Here, the trial court instructed the jury with regard to the (f)(2) and (f)(6) mitigating circumstances in part as follows:

> If one or more of you finds by a preponderance of the evidence that this circumstance exists, you would so indicate by having your foreperson write, "Yes," in the space provided after this mitigating circumstance on the "Issues and Recommendation" form. If none of you finds this circumstance to exist, you would so indicate by having your foreperson write, "No," in that space.

As to nonstatutory circumstances, the trial court instructed the jury as follows:

> You should also consider the following circumstances arising from the evidence which you find to have mitigating value. If one or more of you finds by a preponderance of the evidence that any of the following circumstances exist and also are deemed by you to having [sic] mitigating value, you would so indicate by having your foreperson write, "Yes," in the space provided. If none of you finds the circumstance to exist, or if none of you deems it to have mitigating value, you would so indicate by having your foreperson write, "No," in that space.

With respect to the statutory catchall mitigating circumstance, the trial court instructed the jury as follows:

> If one or more of you so finds by a preponderance of the evidence you would so indicate by having your foreperson write, "Yes," in the space provided after this mitigating circumstance on the "Issues and Recommendation" form. If none of you finds any such circumstance to exist, you would so indicate by having your foreperson write, "No," in that space.

These instructions are consistent with the pattern jury instructions for separate capital sentencing proceedings. *See* N.C.P.I.—Crim. 150.10 (1996) (amended June 1997).

In *State v. Davis*, 349 N.C. 1, 506 S.E.2d 455 (1998), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 67 U.S.L.W. 3748 (1999), we distinguished the jury instructions in question as to mitigating circumstances, which were in form and content substantially similar to the ones in question in the instant case, from those in *Jaynes*. We explained that "the trial court's instructions in *Jaynes* failed to appropriately distinguish between statutory and nonstatutory mitigating circumstances and, in fact, required the same finding as to both." *Id.* at 55, 506 S.E.2d at 485. Here, as in *Davis*,

> the trial court properly informed the jurors that in order to find a statutory mitigating circumstance to exist, all they must find is that the circumstance is supported by a preponderance of the evidence. However, unlike statutory mitigating circumstances, the trial court instructed the jurors that in order to find nonstatutory mitigating circumstances, they must (1) find by a preponderance of the evidence that the circumstance existed, *and* (2) find that the circumstance has mitigating value. These instructions properly distinguished between statutory and nonstatutory mitigating circumstances and informed the jurors of their duty under the law.

*Id.* at 56, 506 S.E.2d at 485. For the reasons stated in *Davis*, we conclude that the jury instructions in the instant case did not constitute error.

**[5]** Defendant next contends that the trial court erred in allowing a lay opinion that the victim remained alive for a period of time following the shooting. On direct examination, Mike Lucas, a customer in the restaurant at the time of the shooting, testified in part as follows:

Q. Were you there at Howard Johnson's when the EMS, Emergency Medical Services arrived?

A. Yes, sir.

Q. And what, if anything, do you recall about their arrival, what they did while they were there?

A. Well, I was back out of the way of and I know they went directly straight to that corner and I couldn't see what was happening in that corner when the EMT's arrived, but I know they were working on Mr. Casey and I saw him being wheeled out of there on a stretcher.

Q. Do you know whether he was dead or alive at that time?

A. I think he was alive when he went by.

Defense counsel objected and moved to strike. The trial court overruled the objection.

Defendant argues that Lucas was not competent to assess whether Casey was alive when he was wheeled out of the restaurant. Allowing this testimony, defendant contends, was prejudicial error entitling defendant to a new capital sentencing proceeding because it led the jury to believe that Casey survived the shooting and suffered until the time of his death.

"The Rules of Evidence, although not applicable to capital sentencing proceedings, nevertheless may be relied upon for guidance when determining questions of reliability and relevance." *State v. Strickland*, 346 N.C. 443, 460, 488 S.E.2d 194, 204 (1997), *cert. denied*, —— U.S. ——, 139 L. Ed. 2d 757 (1998). Rule 701 of the North Carolina Rules of Evidence provides:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (1992).

The Court of Appeals' decision in *State v. McCain*, 6 N.C. App. 558, 170 S.E.2d 531 (1969), is also instructive. There, the court held that a detective's opinion that the deceased was dead at the crime scene was admissible. The court stated, "The question of whether a person is living or dead is not wholly scientific or of such a nature as to render valueless any opinion but that of an expert. Common inferences derived from the appearance, condition, or mental or physical state of persons . . . are proper subjects of opinion testimony by non-experts." *Id.* at 561, 170 S.E.2d at 533 (citation omitted). Here, the testimony of Lucas that "I think he was alive" when he was wheeled out of the restaurant was an inference rationally based on Lucas' perception and helped to clarify his testimony. Thus, we conclude that Lucas' statement was properly admitted.

Defendant next assigns error to the trial court's denial of his challenge for cause to two prospective jurors who he argues could not serve impartially and a prospective juror who suffered from a physi-

cal infirmity. Defendant contends that jurors Denise Boone and Charles Britton should have been excused because of their views on capital punishment and that juror Richard Thiele should have been excused because he suffered from memory loss. Defendant contends that the trial court's refusal to strike Boone, Britton, and Thiele for cause violated defendant's rights under the Fourteenth Amendment to the United States Constitution.

**[6]** In *voir dire* in response to questioning by the State, Boone stated that she would listen to the evidence and keep an open mind. However, in filling out the jury questionnaire, Boone indicated that her view on the death penalty was that someone who kills someone should be executed. Defense counsel questioned Boone based on her responses in the questionnaire in part as follows:

Q. Now, is it your opinion that if you go out and kill somebody, that is, commit murder, that you ought to get the death penalty?

A. Yes.

Q. And would you be inclined to vote for the death penalty in this first degree murder case if you were on the jury?

A. Yes.

Q. Your answer is "yes?"

A. Yes.

Q. Is that in preference, that is, over top of life imprisonment?

A. No.

Q. Which would you prefer in this case, the death penalty or life imprisonment?

After the prosecutor objected and the trial court overruled the objection, the dialogue continued as follows:

A. Death.

Q. Your preference is death . . .

A. (Interjected) Yes.

Q. . . . in a first degree murder case?

A. Yes.

**STATE v. HEDGEPETH**

[350 N.C. 776 (1999)]

After defense counsel further questioned Boone, he challenged her for cause. The trial court then questioned Boone in part as follows:

THE COURT: Is your view of preference for the death penalty so strong that it would cause you to automatically vote for the death penalty and against life in every first degree murder case without regard to the evidence presented or the law?

MS. BOONE: No.

THE COURT: Is your feeling of preference to the death penalty such that it would prevent or substantially impair your ability to follow your duties as a juror and to follow the law of North Carolina?

MS. BOONE: Yes.

THE COURT: You're saying that your preference for the death penalty is so strong that it would prevent or impair your ability to follow the law?

MS. BOONE: Yes.

THE COURT: Are you saying to me then that you feel so strongly about the death penalty that if the law tells you to consider both possible punishments that it would impair or prevent your ability to follow the law?

MS. BOONE: No.

THE COURT: Are your feelings about the death penalty in favor of the death penalty so strong that regardless of the facts and circumstances—let me back up. Taking into account your feelings about the death penalty and your preference as you expressed it, would you be able to render a verdict in this case with respect to the law of North Carolina, in accordance with the law of North Carolina?

MS. BOONE: Yes.

In response to further questioning by the trial court, Ms. Boone indicated that she could follow the law and keep an open mind until she heard all the evidence and the trial court's instructions, but upon further questioning by defense counsel, the following exchange occurred:

Q. Are you saying to me that if you serve on this jury, you will vote for the death penalty in this case because this man has been convicted of murder?

A. Yes.

Q. You're saying that. And is it your testimony to me now that without hearing anything but knowing he's convicted, been convicted, you favor the death penalty in this case, is that what you're saying?

A. Yes.

In an attempt to reconcile and clarify Boone's responses, the trial court questioned Boone again as follows:

THE COURT: Are your feelings in favor of the death penalty so strong that you cannot consider life imprisonment?

MS. BOONE: No.

THE COURT: Are your feelings in favor of the death penalty so strong that it would substantially impair your ability to consider life imprisonment?

MS. BOONE: No.

After questioning Boone further, the trial court denied defendant's challenge for cause, and defendant excused Boone peremptorily.

"[T]o determine whether a prospective juror may be excused for cause due to that juror's views on capital punishment, the trial court must consider whether those views would '["]prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.["]'" *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) [(quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980))]." *State v. Bowman*, 349 N.C. 459, 469-70, 509 S.E.2d 428, 435 (1998), *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 67 U.S.L.W. 3784 (1999). "Absent an abuse of discretion, it is the trial court's decision as to whether [a] prospective juror's beliefs would affect [his or] her performance as a juror." *Id.* at 471, 509 S.E.2d at 436.

"The trial court has the opportunity to see and hear a juror and has the discretion, based on its observations and sound judgment, to determine whether a juror can be fair and impartial." *State v. Dickens*, 346 N.C. 26, 42, 484 S.E.2d 553, 561 (1997). While Boone's

questionnaire responses and some of her responses during *voir dire* indicated that she preferred the death penalty for those convicted of murder, the trial court was able upon further questioning to discern that she was capable of putting aside her personal preference for the death penalty and of following the law. We conclude that the trial court did not abuse its discretion in denying defendant's challenge for cause of prospective juror Boone.

**[7]** During *voir dire*, defense counsel questioned prospective juror Britton as follows:

Q. My question was, would you find it difficult, in view of your attitude, would you find it difficult to recommend the existence of mitigating circumstances in this case or any case?

A. I can't answer fully until I've heard everything, but I believe that in my personal beliefs I believe that premeditated murder, it would be hard for me to find a mitigating circumstance for that.

Q. All right, sir. And in view of that response, would you say to me that in a first degree premeditated murder case that you would find it difficult to recommend the existence of a mitigating circumstance?

A. Yes, sir, that's a true statement.

Q. All right. And on the other hand, you would not find it difficult to recommend the existence of an aggravating circumstance?

A. No, sir.

During further questioning by the trial court, Britton stated that he would do his best to follow the law as instructed by the trial court, that he believed that he could be a fair and impartial juror in the case, but that he was not certain that he could be fair and impartial. Upon further questioning from the trial court, Britton indicated that he could fairly and impartially apply the law, consider the evidence, and render a recommendation in the case based on the evidence presented and the law as instructed by the trial court.

We have previously stated that " 'in a case . . . in which a juror's answers show that he could not follow the law as given . . . by the judge in his instructions to the jury, it is error not to excuse such a juror.' " *State v. Cunningham*, 333 N.C. 744, 754, 429 S.E.2d 718, 723 (1993) (quoting *State v. Hightower*, 331 N.C. 636, 641, 417 S.E.2d 237, 240 (1992)) (alterations in original). Britton's answers, however, do

not sufficiently show that he could not follow the law. To the contrary, they evince a willingness to follow the law as instructed by the trial court. We, therefore, cannot conclude that the trial court abused its discretion in denying defendant's challenge for cause of prospective juror Britton.

[8] Under N.C.G.S. § 15A-1212(2), a party may challenge a juror for cause on the grounds that the juror "[i]s incapable by reason of mental or physical infirmity of rendering jury service." N.C.G.S. § 15A-1212(2) (1997). Defendant argues that prospective juror Thiele suffered from memory loss that rendered him incompetent to serve as a juror.

During *voir dire*, in response to the prosecutor's questioning, Thiele discussed the fact that he was under treatment for an inoperable brain tumor. The following exchange later occurred between defense counsel and Thiele during *voir dire*:

Q. ... Now, as a result of your brain tumor, have you experienced any mental difficulty?

A. Memory, short-term memory.

Q. And does that have any effect on your attention, your ability to pay attention or your ability to focus your attention?

A. I don't believe so.

Q. All right. But it might have an impact on your ability to remember?

A. Possibly, I mean it's hard to answer that.

After defense counsel challenged Thiele for cause, the trial court questioned Thiele further about his memory loss in part as follows:

THE COURT: ... Do you feel that you have any memory loss that would impair or affect your ability to serve on a jury knowing what a jury is expected to do?

MR. THIELE: It's hard to say. I would try to as best—to the best of my ability. I don't know how else to answer that.

THE COURT: I certainly understand that, but what do you think the best of your ability will do in that regard? Thinking about what you do in your other activities such as work, whether it's remembering lectures or sermons or other things you do in church or family, other things as well?

MR. THIELE: I hope that it wouldn't affect it, but that's a hard question for me to answer.

THE COURT: Have you noticed any significant change in that since, that is, has it gotten worse as time has gone on in the last year and a half, gotten better, remain [sic] the same, or is it something you noticed before the diagnosis?

MR. THIELE: I think it's gradual worsening.

THE COURT: You said it's not affecting your ability to concentrate on matters, that is . . . .

MR. THIELE: (Interjected) I can do the tasks at hand.

THE COURT: And you're not having any trouble maintaining your attention on tasks at hand as you said?

MR. THIELE: That's correct.

In response to the trial court's questioning, Mr. Thiele went on to state that as a consequence of his memory loss, he had "to pay more attention to scheduling and writing things down" but that he was "functioning all right." He also stated that his memory loss sometimes caused him to lack confidence in his ability to recall facts. On further questioning by the trial court, Thiele stated that the ability to take notes during the trial would be helpful to him.

It is well settled that "[t]he trial court's ruling on a challenge for cause will not be overturned absent abuse of discretion." *State v. Quick*, 329 N.C. 1, 17, 405 S.E.2d 179, 189 (1991). In the case *sub judice*, the trial court seemed convinced that Thiele's brain tumor and consequent loss of memory had not interfered with his full-time job as a loan officer and office supervisor and that note-taking during the trial would likely compensate for any impairment of his memory. After carefully examining Thiele, the trial court, in its discretion, was satisfied that he was competent to render jury service. Consequently, the trial court rejected defendant's challenge of Thiele for cause and denied defendant's request for an additional peremptory challenge.

We conclude that the denial of defendant's challenges for cause of prospective jurors Boone, Britton, and Thiele did not constitute an abuse of discretion. This assignment of error is overruled.

[9] Defendant next contends that the trial court erred in excusing prospective jurors Harold Vick and Frank Luis for cause. Defendant

argues that these prospective jurors should not have been excused for cause because although they stated that they would be uncomfortable imposing the death penalty, they also expressed support for the death penalty. Defendant contends that the trial court's excusing Vick and Luis for cause violated defendant's constitutional rights.

When, during *voir dire*, the prosecutor asked prospective juror Vick how he felt about the death penalty, Vick initially answered, "I don't quite know how to answer that." When asked again, he responded, "Well, I guess it would depend on the case." The following exchange occurred as the prosecutor questioned Vick further:

> Q. . . . You understand there are some people and there's nothing wrong with this, there are some people who would say, well, yeah, I guess I believe in it, but I could never sit on a jury where that was one of the choices. You understand? Do you feel that way, you say, you know, I believe in the death penalty or it might be all right in some cases but I would never vote to impose it on anybody?
>
> A. Well, I would say I believe in it but like you say when you get right down to it, when a person's life is in your hands regardless of what they've done, you know, it might be difficult.

When the trial court questioned Vick further, the following exchange occurred:

> Q. . . . But every juror who sits in there has got to be willing to do both [recommend the death penalty or life imprisonment] . . . , you understand what I'm saying?
>
> A. Uh huh.
>
> Q. Okay. Do you feel you're that type person, that you're willing to consider both punishments?
>
> A. I would say so.
>
> Q. Have you felt that the death penalty was a necessary law, have you felt that most of your adult life?
>
> A. Is this a yes or no question?
>
> Q. Yes, sir.
>
> A. Well, you got to draw the line somewhere, so I would have to say yes.

Later, the prosecutor asked Vick the following question:

> Q. If the State of North Carolina was to present evidence in this case and the defendant was to present evidence, if they chose, if after hearing this evidence and the law that the Judge gives you if you were satisfied that the death penalty ought to be imposed in this case right here, could you, yourself, recommend the death penalty knowing that the Court would be bound and would follow your recommendation?

After the trial court overruled an objection by defense counsel, Vick answered as follows, and the following exchange took place:

> A. I don't know that.
>
> Q. Can you explain why you don't know that?
>
> A. It's like I told you while ago, you know, when you take another human's life into your hands, I'd be doing the same thing that he did or if he did it, or whatever, you know. Right or wrong, I still would have to live with that.
>
> Q. Well then, would it be fair to say that you would just be—for whatever reason you feel that you just could not because of your views about imposing the death penalty, that you simply could not vote to impose the death penalty in this case no matter what the evidence is?
>
> A. I won't say I could not, but I could say it would be difficult.

After the prosecutor challenged Vick for cause, the court questioned Vick in part as follows:

> THE COURT: . . . Are your feelings such that you could ever vote in favor of a death penalty?
>
> MR. VICK: I really think that would depend on the circumstances.
>
> THE COURT: So, is that saying to me that there are circumstances under which you could vote for a death penalty?
>
> MR. VICK: Naturally, you know, if you know somebody that's involved in something it would be easier to vote or if you have feelings toward somebody that's been involved in something it would be easier. If it was a family member of mine it could be easier for me to vote for the death penalty, but people you don't

know, you know, it's—maybe it's just feelings. I'm trying to be honest again.

THE COURT: In that case that you gave an example of would that be a situation where maybe you wouldn't feel like you were being fair and impartial?

MR. VICK: Right.

THE COURT: Now, being a fair and impartial juror, are there circumstances under which you could vote in favor of a death penalty?

MR. VICK: I don't know that.

THE COURT: All right. Are your feelings about this such then that they would prevent or substantially impair your ability to perform your sworn duties as a juror?

MR. VICK: I would say so.

The trial court then granted the prosecutor's challenge for cause and ruled "that the feelings expressed by this juror indicate that his views are such that [they] would prevent or substantially impair his ability to perform his sworn duties as a juror and that he would not be qualified to serve."

During questioning by the prosecutor in the *voir dire* of prospective juror Luis, Luis stated his belief that the death penalty is "necessary in certain circumstances." During further questioning, after Luis was asked, over defense counsel's objection, whether he "could be part of the legal machinery which might bring the death penalty about in this particular case as a juror," the following exchange occurred:

A. Like you said, I believe in the death penalty but I don't know if I could, you know, be the one, you know, that says, well, he's sentenced to death, you know, that's a lot of responsibility.

Q. Right. Would you say that you've got mixed feelings about that?

A. Yeah.

Q. And you understand that's all right, that's fine, and all we want you to do is just be completely honest about what you could and couldn't do?

A. Right.

**STATE v. HEDGEPETH**

[350 N.C. 776 (1999)]

Q. You understand that in order for somebody to sit on this jury, okay, regardless of who it is, whether it's you or any other juror, they must be able to consider imposing the death penalty on this defendant, okay?

A. Right.

Q. And they must be willing to do it under certain circumstances and they must be willing to consider imposing a life sentence on this defendant and be willing to do it under certain circumstances? You understand what I mean?

A. Yes, I understand.

Q. Are you saying that you feel that you just couldn't do that?

A. I think so.

Q. Okay. Is that because even though you, even though you feel like the death penalty is a necessary law, you just feel that you couldn't vote to impose it on anybody?

A. Right.

After further questioning in which Luis unequivocally stated that, because of both personal and religious reasons, he could not vote to impose the death penalty on Hedgepeth or anyone else and acknowledged that his views on the death penalty would either prevent or substantially impair his ability to perform his duties as a juror, the prosecutor challenged Luis for cause. Defense counsel objected but did not request to examine the witness, and the trial court allowed the challenge for cause of Luis.

"[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding [prospective jurors] for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85 (1968). Jurors, however, may be excluded for cause if their views on capital punishment would " 'prevent or substantially impair the performance of [their] duties as a juror in accordance with [their] instructions and [their] oath.' " *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52 (quoting *Adams*, 448 U.S. at 45, 65 L. Ed. 2d at 589). "A prospective juror's bias or inability to follow the law does not have to be proven with unmistakable clarity, and the decision as to whether a juror's views would substantially impair the performance

of his [or her] duties is within the trial court's broad discretion." *State v. Gregory*, 340 N.C. 365, 394, 459 S.E.2d 638, 655 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996).

Here, prospective juror Vick's responses during *voir dire* strongly indicated his potential inability to consider the death penalty, while the responses of prospective juror Luis revealed a complete unwillingness to consider the death penalty. The trial court reasonably found that the personal views of both Vick and Luis would substantially impair their performance as jurors. Thus, we conclude that the trial court did not abuse its discretion in excusing prospective jurors Vick and Luis for cause.

## PROPORTIONALITY REVIEW

Having found no error in the guilt-innocence phase in *State v. Hedgepeth*, 330 N.C. 38, 409 S.E.2d 309, and no error in defendant's new capital sentencing proceeding herein, we are required to review the record and determine (1) whether the record supports the aggravating circumstance found by the jury; (2) whether "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor"; and (3) whether "the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2). We engage in proportionality review as a safeguard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980).

Here, as noted above, the jury found the aggravating circumstance that the murder was part of a course of conduct in which defendant engaged, including defendant's commission of other crimes of violence against another person or persons. N.C.G.S. § 15A-2000(e)(11). After meticulous review and careful deliberation, we conclude that the aggravating circumstance submitted to and found by the jury is fully supported by the record. We further conclude that there is no indication that the sentence of death was imposed under the influence of passion, prejudice, or another arbitrary factor.

[10] Finally, we must consider whether imposition of the death penalty in defendant's case is disproportionate or excessive in comparison to similar cases. We note that on seven occasions, this court has concluded that the sentence of death was disproportionate. *State*

v. Benson, 323 N.C. 318, 372 S.E.2d 517 (1988); State v. Stokes, 319 N.C. 1, 352 S.E.2d 653 (1987); State v. Rogers, 316 N.C. 203, 341 S.E.2d 713 (1986), overruled on other grounds by State v. Gaines, 345 N.C. 647, 483 S.E.2d 396, cert. denied, 522 U.S. 900, 139 L. Ed. 2d 177 (1997), and by State v. Vandiver, 321 N.C. 570, 364 S.E.2d 373 (1988); State v. Young, 312 N.C. 669, 325 S.E.2d 181 (1985); State v. Hill, 311 N.C. 465, 319 S.E.2d 163 (1984); State v. Bondurant, 309 N.C. 674, 309 S.E.2d 170 (1983); State v. Jackson, 309 N.C. 26, 305 S.E.2d 703 (1983).

This case has several characteristics that distinguish it from those cases in which we have determined the death penalty to be disproportionate. Here, in upholding defendant's conviction, we noted that "[t]here [was] plenary and convincing evidence of all elements of first-degree murder, including premeditation and deliberation." Hedgepeth, 330 N.C. at 46, 409 S.E.2d at 314. "A conviction based on the theory of premeditation and deliberation indicates a more calculated and cold-blooded crime." State v. Davis, 340 N.C. 1, 31, 455 S.E.2d 627, 643, cert. denied, 516 U.S. 846, 133 L. Ed. 2d 83 (1995). Furthermore, not only did defendant intentionally kill Casey, he also assaulted Mrs. Hedgepeth with a deadly weapon with the intent to kill inflicting serious injury.

Of the cases in which we found the death penalty disproportionate, Bondurant and Rogers are the only two where the jury found the (e)(11) aggravating circumstance, found in the instant case, that the defendant engaged in a course of conduct which involved a crime of violence against another. In Bondurant, immediately after he shot the victim, the defendant directed the driver of the car in which he and the victim had been riding to go the hospital. This Court was impressed by the fact that "[i]n no other capital case among those in our proportionality pool did the defendant express concern for the victim's life or remorse for his action by attempting to secure immediate medical attention for the deceased." Bondurant, 309 N.C. at 694, 309 S.E.2d at 182-83. Here, in fact, a news director testified that at the police station after the shooting, defendant looked at him; shrugged his shoulders; smirked; and said, "Man, I ran out of bullets." Such a statement strongly suggests that defendant's only regret was that he did not succeed in killing Mrs. Hedgepeth.

In Rogers, the only other case where the jury found the (e)(11) aggravating circumstance and in which we have found the death penalty disproportionate, the defendant mistakenly shot the victim

IN THE SUPREME COURT

while attempting to shoot a friend of the victim's. Here, there was evidence that defendant had contemplated killing Casey and Mrs. Hedgepeth for months prior to the shooting. After comparing the case *sub judice* to the seven cases in which this Court has concluded that the sentence of death was disproportionate, we conclude that this case is not substantially similar to any of them.

We continue our inquiry by comparing this case to the cases in which this Court has found the death penalty to be proportionate. "Although we review all of these cases when engaging in this statutory duty, we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Davis*, 349 N.C. at 60, 506 S.E.2d at 488. As we noted in *Bowman*, 349 N.C. at 482, 509 S.E.2d at 442, the (e)(11) aggravating circumstance, found by the jury here, is one of "four statutory aggravating circumstances which, standing alone, this Court has held sufficient to support a sentence of death." *See also State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). In addition, "[a] single aggravating circumstance may outweigh a number of mitigating circumstances and may be sufficient to support a death sentence." *Id.* at 110, 446 S.E.2d at 566.

Here, the trial court submitted and the jury found the aggravating circumstance that the murder of Casey was part of a course of conduct in which defendant engaged and which included another violent crime, the shooting of Mrs. Hedgepeth. Defendant intended to kill both Casey and Mrs. Hedgepeth and succeeded in killing Casey. We conclude that this case is more similar to cases in which we have found the sentence of death to be proportionate than to those in which juries consistently have returned recommendations of life imprisonment. Based on the nature of this crime, we cannot conclude that the sentence of death is disproportionate or excessive.

Defendant received a fair capital sentencing proceeding, free from prejudicial error. Accordingly, we leave the judgment of the trial court undisturbed.

NO ERROR.